# CHARLESTON.

DAVIDSON, ADMR. ETC. *v.* DAVIDSON *et als.*

Submitted June 7, 1912.   Decided September 30, 1913.

1. WILLS—*Contract to Make Will—Consideration—Warranty.*

A parol contract between an unmarried woman and her seducer, a man of large property, shortly after the birth of her child, upon consideration that if she would not prosecute him for bastardy he would "provide for her and her child by will and that he would make the same provision for them as if he were married" to her, considered in the light of the surrounding facts and circumstances, is supported by a sufficient consideration

and is sufficiently definite and certain in terms, to be binding
on his estate and enforceable.   (p. 750).

2.  SAME—*Contract to Make—Enforcement.*
    An oral contract to make a will, if certain and definite in
    its terms, and upon sufficient consideration, if equitable, is
    valid, and enforceable against the estate of a decedent, as any
    other valid contract.   (p. 751).

3.  SAME—*Contract to Make—Evidence.*
    Contracts of this character, however, are viewed by courts
    with suspicion, are not favored, and to be enforceable must be
    upon sufficient consideration, be equitable, and definite and
    certain in their terms, and clearly proven.   (p. 753).

Appeal from Circuit Court, Monroe County.

Bill by William A. Davidson, administrator, against George
T. Davidson and others.   Decree for plaintiff, and defendants
French Shultz, his next friend, and others, appeal.

*Affirmed.*

*J. W. Arbuckle* and *G. C. Osborne,* for appellants.

*Sanders & Crockett, J. L. Rowan* and *Clark & Keadle,* for
appellee.

MILLER, JUDGE:

Appellants, Susan Shultz and French Shultz, an infant, by
Susan Shultz, his next friend, intervened by petition in the suit
by plaintiff to convene the creditors and marshal the assets of
C. H. Davidson, deceased, and because of deficiency of per-
sonal assets, to obtain a decree for the sale of sufficient of de-
cedent's lands to pay creditors in full.

French Shultz, as the petitions show, is the illegitimate son
of Susan Shultz, by the deceased C. H. Davidson. The object
of the petitions was to enforce specific performance of an alleged
contract between Susan Shultz and said Davidson in his life
time, made for her own and the benefit of her infant son, as it
is alleged in consideration of her forbearance to sue Davidson
for breach of promise of marriage and in bastardy proceedings
proposed or threatened by her.

According to her individual petition the alleged contract
between petitioner and Davidson was, substantially, that said

Davidson, being at the birth of her child possessed of a large estate, and being desirous of concealing from his father the paternity of the child, for fear that his father would disinherit him, shortly after the birth of the child, promised and agreed with her, in consideration that she would not institute such bastardy proceedings "to provide for her and the child by will and that he would make the same provision for them as if he were married to petitioner." She alleges that decedent re-iterated this promise to petitioner's mother and to her sisters, "telling them to tell and assure her for him that he would pro-vide for her and her child, if she would not swear the child to him." She further alleges that in consideration of said promises and the love and affection had for and confidence and trust reposed in him she abstained from bringing suit or taking any action in the courts against decedent, and so continued and remained true to him up to the time of his death.

Another allegation of her petition is that "in pursuance of this contract and agreement the said C. H. Davidson exe-cuted a will and in it made provision for petitioner and left to her said son    *    *    *    the sum of $10,000 of which said will he duly informed this petitioner;" "that afterwards he de-stroyed this will and declared his intention of increasing this legacy to the sum of $30,000, but if he made another will it has not been found." She charges "that at the time the said C. H. Davidson destroyed said will, he was not in a mental condi-tion to know or understand what he was doing." The petition contains a charge that by reason of said contract to provide for her, as if married to him, petitioner has the right to charge his estate with a large sum, to-wit, one third of the value of said estate for her life.

The prayer of the petition is that the personal representa-tives and heirs of decedent be treated as trustees holding for her benefit the estate of which the said C. H. Davidson died seized.

In the petition of the infant petitioner, by his mother as next friend, the inducement and consideration for the alleged contract are stated substantially as in her petition, and the con-tract alleged to have been made on behalf of petitioner coincides in part with the contract as alleged in her petition, as fol-

lows: "That the said Charles H. Davidson then promised the mother of this petitioner that if she would not institute the said proceedings against him that he would provide for her and this petitioner by will the same as if they were married." But following that allegation is this charge: "That he afterwards promised her to leave this petitioner $15,000.00 by his will, if she would not sue him, and repeatedly sent these promises to her by others," and that he repeated this proposition to petitioner's grandmother and aunts.

The prayer of this petition is that petitioner "be allowed his claim of $15,000.00 as aforesaid against the estate of Chas. H. Davidson, deceased."

There was a demurrer to these petitions by the adult defendants, who also answered, putting in issue every material allegation therein; and the infant defendants also answered formally by their guardian ad litem, and on final hearing on pleadings and proofs taken and the report of the master commissioner, and exception thereto, by defendants, the court below denied petitioners any relief and dismissed their petitions out of the cause, and that is the decree which they seek to have reversed on this appeal.

The commissioner in his report found that C. H. Davidson agreed with Susan Shultz to provide for her in his will a comfortable support for her life time, provided she would not sue him for breach of promise of marriage or bastardy, "that it will take $181.25" per year, and which on the basis of her life expectancy, 10.705 years, would amount to $1,940.28, which sum he found in her favor, to be paid out of decedent's estate as a general lien; and he found in favor of the infant petitioner the sum of $15,000.00 to be likewise paid out of the estate of decedent.

It is conceded by counsel that a contract to make a will, if certain and definite in its terms and upon sufficient consideration, is valid, and like any other contract, and that by the same rules it will be enforced. For this there is abundant authority. Page on Wills, §§70-83; Gardner on Wills, Ch. IV, §§19-21; 1 Underhill on the Law of Wills, §§285-294; *Johnson* v. *Hubbell*, (N. J.) 66 Am. Dec. 773, and note, p. 783; *Rice* v. *Hartman*, 84 Va. 251; *Cox* v. *Cox*, 26 Grat. 305, Anno. 107, and note. The

law in such cases is the same, substantially, as in the cases of parol contracts for deeds. *Frame* v. *Frame,* 32 W. Va. 463; *Burkholder* v. *Ludlam,* 30 Grat. 255, Anno. 94, and note; *Townsend* v. *Vanderwerker,* 160 U. S. 171, 40 Law Ed. 383.

It is practically conceded, also, that the consideration for the alleged promise set forth in the petitions would be sufficient to support a valid promise by decedent to provide for petitioners by will. So the controversy here is narrowed to three questions, namely: First, is the contract alleged definite and certain so as to be enforceable? Second, if it is, is the contract proven as alleged, or does the proof show any contract with decedent which is enforceable? Third, if a valid contract is alleged and proven, is it affected by the statute of frauds, or taken out of the statute of frauds by part performance of the contract by petitioner Susan Shultz?

On the first proposition, according to the petitions, the alleged promise of decedent, for the consideration alleged, was to provide for petitioner and her child by will, making the same provision for them as if he was married to her. What is the meaning of such a promise? Does it amount to a promise by decedent, as the petitions imply, to will to petitioner all the property of which he might die seized? If so, in what proportion? Or does it mean such parts of decedent's estate as petitioners would take, if marriage had followed, and without will? Decedent, if married, might have disposed of his estate by will so as to wholly cut out his child, but not his widow. Would the alleged contract have prevented such disposition of his estate? These are some of the questions naturally presented in connection with the alleged contract. Mr. Page in his work on wills, on the subject of the certainty of such contracts, referring in foot note to the decisions, gives illustrations of contracts which have been held invalid and of others held to be valid, as follows: "A contract to bring up a child, educate it and make it the 'heir' of promisor has been held to be unenforceable in Kentucky. And an ante-nuptial contract by which the husband agrees to adopt his wife's children by a former marriage as his 'heirs' has been held not to be a promise to make a devise of the husband's property to them, but to leave the husband with the same power of excluding them from a share

in his Illinois realty that he would have had of excluding his own children. A similar contract has been held valid and enforceable in Missouri. Or the promisor may definitely intend to make some testamentary disposition of his property in favor of promisee, but he does not decide what provision he will make. Thus, he may agree to leave promisee 'as much as any relation he had on earth,' or that while promisor lived promisee should have a good home, and at his death she should be provided for so that she should never want as long as she lived; or that he will provide for the adopted child as he does for his own children, and his will makes his own children residuary legatees. These agreements are too indefinite to be enforced.

"An agreement in writing to leave by will to an employee as much as he would lose by declining an offer of a partnership in a competing firm, in consideration of his declining such offer and remaining in the employ of promisor was held to be too indefinite for enforcement in law or in equity. But a promise to leave promisee so much property 'that she need not to work,' or to leave her 'independently rich,' or to make her 'his heir,' or to leave promisee all the property that promisor owned at his death; or to leave promisee 'a child's share' in the estate of promisor, where promisor was at the date of the contract and always remained childless; or to make 'adequate compensation,' have been held to be definite enough to maintain an action upon.

"A contract to bequeath so much of an annuity as should remain unexpended at the death of the annuitant is enforceable, although the amount is uncertain."

In the interpretation of contracts we must always keep in mind that it is the policy of the law to give force and effect thereto, if possible, and within well recognized canons. On the question of the definiteness and certainty necessary to give effect to a contract, one salutary rule is that that will be regarded definite and certain which by reference to the facts and circumstances surrounding the parties, and which were evidently in mind when making the contract, can be rendered certain and definite. In this case the parties to the contract were not married. According to the petitions marriage was contemplated after the death of decedent's father. What was evidently intended by the parties to the contract was that decedent would in

the mean time so provide by will that in the event of his death
the woman he had seduced, and the child by that act, should be
provided for, and in case of his death should have of his estate
what they would naturally take without will if marriage had
ensued, and the relation of husband and wife and parent and
child had thereby been established. So interpreted, is not the
contract alleged sufficiently definite and certain to be enforce-
able? We are disposed to hold, in the light of the facts alleged
attending the making of the contract, and the situation and cir-
cumstances of the parties, that the contract was valid and bind-
ing, and enforceable, and with the circuit court to hold the de-
murrers properly overruled.

While it is true the mother in her petition alleges, rather in-
consistently with the terms of the contract as alleged, that de-
cedent in pursuance of the contract executed a will making
provision for her and leaving to her son $10,000; and in the
petition filed on behalf of the son, alleges that decedent after-
wards promised to leave him $15,000.00, these alleged acts and
promises of decedent could not take away the rights of petition-
ers under the contract, unless they should elect to accept such
provisions in full performance of the contract as originally made.

The next inquiry is, does the proof establish the contract as
alleged, or any contract enforceable against decedent's estate?
We do not think it arises to the dignity of full and clear
proof, required in all such cases. It is conceded that the evi-
dence of Miss Shultz, objected to, is wholly incompetent. But if
it could be considered, what does it amount to? The substance
of it, so far as it applies to any contract with decedent, is that
some two days after the birth of the child decedent visited her
at her room, and in the presence of her sister, Mrs. Heavener,
and with the child in his arms, acknowledging it to be his own,
said to her that he did not want any trouble, and did not want
her to swear the child to him, that he meant to take care of her
and the child, and told her sister to take care of them, that he
meant to take care of them, and meant to give them everything
he had, and that he did not want any trouble for fear his father
would disinherit him, and that he meant to marry her after his
father's death. She also swears that he stated the same thing to
her mother and requested her not to allow witness to swear the

child to him, or sue him, and that he meant that all he had was for her and the child, and that he meant to will or give it to them. Did this language of decedent amount to more than the expression of a then present purpose to so provide by will for petitioners? We hardly think so. True we may say it evinced great anxiety on his part not to be exposed, and he evidently meant by representing his purposes to provide for her to persuade Miss Shultz not to sue him. But did it all amount to a contract? Did both parties understand that they were entering into a solemn contract that was to be enforceable and legally binding on him in the courts, cutting off other disposition of his property by will or otherwise for all time? We can not so interpret their conversation as detailed by the witness. Nor is the case strengthened by her testimony, that decedent afterwards told her he had provided for her and her child by his will.

But now as to the evidence of Mrs. Heavener, the sister, present at the time of the alleged contract. The whole of her evidence as to what took place between decedent and her sister, in the latter's room on the occasion of the alleged contract is in substance this; addressing the witness, decedent said, "I want you to be good to Susan and take good care of the boy for I have made promises to her and mean to fulfill them." She says there was no one present but Susan, herself, Mr. Davidson and the baby. What promises he is supposed to have referred to does not appear. The witness had heard all the conversation between deceased and her sister, as detailed by the latter in her evidence, which we do not think amounted to a contract, though imposing on him moral obligations. He may have been referring to his previous promises of marriage, for Miss Shultz does not swear that deceased had ever before that promised to make provision for her and her child by will. Mrs. Heavener further swears that Davidson left her sister's room on the occasion just referred to, and as he left the house, he said to her, "be good to Susan and take good care of the child and not let her swear the child for it might cause trouble at home, that he was afraid his father would disinherit him and for me to go back upstairs and tell Susan not to trouble for he intended to do everything for them he had promised."

But this witness gives evidence of another agreement some

six weeks after the birth of the child, when her brothers James and Phineas had come to see her sister Susan and to have her swear the child to Davidson. She says Davidson was there, and took her out and requested her to go to her sister Susan and tell her not to swear the child to him, and that he would give her and the child everything that he possessed; that she communicated these promises of Davidson to her sister, and persuaded thereby she was prevented from instituting suits against him. She says Davidson knew on this occasion the purposes of her brothers who were present on that day. Mrs. Heavener also swears that later Davidson said to her he wanted her to quit worrying about Susan and the child, for he had willed the boy and her thirty thousand dollars, that she told him she did not want money without protection, that he replied that he had willed them the money and intended to protect them too.

We must admit that the alleged proposition of Davidson to Miss Shultz, through Mrs. Heavener, on the latter occasion rises more nearly to the dignity of a contract than the former, given in evidence by petitioner and this witness. But how he was to give them his property, whether by deed or will does not appear. But this witness says Davidson subsequently told her he had willed petitioner thirty thousand dollars. Phineas Shultz, the brother, swears, that on the occasion of his and his brother's visit, the same upon which Davidson is represented by Mrs. Heavener to have communicated through her the proposition to her sister, that when told something would have to be done, his sister said she would see Davidson, that she went to him and after they had talked some little time she came back and reported that Davidson did not want her to swear the child to him, and that "he would either marry her or would make them entitled to what he possessed." This statement he repeated on his cross-examination. This evidence of what occurred on the occasion in question, and the theory of a proposition made by Davidson to Miss Shultz, through Mrs. Heavener, is not exactly in harmony. According to Mrs. Heavener the alleged proposition made through her, was the accepted one, and the one on which her sister acted. The proposition according to her brother was that deceased would either marry her *or* give her all he possessed.

According to the mother, Mrs. Mary Shultz, Davidson said to her, on the occasion of his first visit, after the birth of the child: "Take good care of Susan and the boy, I am going to marry Susie and you tell her not to sue or swear the child to me," and that he had thirty thousand dollars that he intended for them. She says Davidson requested her to communicate this message to her daughter, which she did. The testimony of Mrs. Burd, the other sister, is substantially the same as that of the mother. Other witnesses swear. to conversations with and declarations of Davidson in his life, that he had willed his property or money to petitioners, and that he intended to marry her, &c.

Many letters from Davidson were introduced, in connection with the evidence of Miss Shultz, covering a period of eight or nine years, before his death, which were objected to, all expressing great love and affection for mother and son, and holding out assurances of his purpose to fulfill his promises. In none of them, however, is any reference made to his alleged promises to make a will, or leave petitioners his property.

Again, we inquire, is all this competent evidence sufficient to establish the contract as alleged, or any contract enforceable in law or equity? Certainly it does not clearly establish a specific contract to make provision for petitioners by will, giving them the same as they would take by marriage. But from all of it may we properly extract a definite and certain contract or promise based on good consideration, such as is alleged, or one which by proper amendment might be alleged, and enforceable as such? We acknowledge great temptation, under the circumstances of this case, to strain every rule and principle, and every exception thereto, in order to so interpret the evidence. But we have been unable to reach the conclusion that any definite and certain contract was ever made which can be enforced. We are bound by the rule that such contracts are viewed by courts with suspicion, are not favored, and to be enforceable must be upon sufficient consideration, and be equitable, and clear and definite in terms. Page on Wills, §§ 71, 73; *Freeman* v. *Morris,* (Wis.) 120 Am. St. Rep. 1038; *Swann* v. *Housman,* 90 Va. 816; *Dicken* v. *McKinley* (Ill.), 54 Am. St. Rep. 471; *Wall's Appeal,* 111 Pa. St. 460, 56 Am. Rep. 288; *Wood* v. *Evans,* 113 Ill. 186, 55 Am. Rep. 409.

As is often said, courts can not make contracts for parties, or render by judicial decision, contracts enforceable, which have not been rendered so by the previous voluntary acts of the parties. The hardship in this case is great, but the parties should have reduced their contract to writing, or made it clear and certain; that they did not do so during the long period that intervened between the date of the birth of the child and the death of decedent, is a circumstance evincing the fact that petitioners relied on deceased to fulfill his expressed purpose and intention to make provision for them by will, but without a contract enforceable by the courts.    It is unfortunate that they were not better advised—a misfortune which can not be remedied by the courts by unwarranted judicial action.

No legal contract having been established it is unnecessary for us to consider the question of the statute of frauds.

Our conclusion is to affirm the decree below, and we will so order.

*Affirmed.*