IN THE MATTER OF THE PROBATE OF THE LAST WILL AND TESTAMENT OF WILLIAM M. WERKMAN, *Deceased*

(No. 9081)

Submitted September 4, 1940. Decided November 12, 1940.

584

*McGinley, Paull and Petroplus* and *Frank W. Nesbitt,* for plaintiff in error.
*Erskine, Palmer & Curl,* for defendant in error.

Fox, Judge:

This is a statutory proceeding, coming to us from the Circuit Court of Brooke County, involving the probate of a paper as the last will and testament of William M. Werkman, deceased. The trial court, on appeal from the county court, reversed the action of said court and refused probate, and this writ of error is prosecuted in the name of Ethel C. Kaltenbach under circumstances which this opinion will relate.

William M. Werkman and Rose Werkman, his wife, were married in the year 1902, and thereafter lived in the City of Wellsburg. No children were born of this marriage. On April 23, 1936, they executed separate wills, by which the entire estate of each was devised to the other. The circumstances surrounding the execution of these wills will be hereafter discussed. Rose Werkman died in April, 1938, leaving surviving her husband and a child, Ethel C. Kaltenbach, who was born out of wedlock of a father other than William M. Werkman. Rose Werkman's will was admitted to probate and her husband took her estate thereunder. William M. Werkman did not formally revoke his will, and died in July, 1939. Ethel C. Kaltenbach, hereafter designated as the proponent, then presented the said will for probate. It is conceded that if

said will be admitted to probate, his entire estate will pass to Ethel C. Kaltenbach, under the provisions of Code, 41-3-3; whereas if probate is refused said estate will go to the heirs-at-law of William M. Werkman, who are parties to this proceeding and resist the probate of the will, and who will be hereafter designated as the contestants.

A preliminary question should be considered at this point. The order of the trial court, refusing the probate of the will, was entered on the 20th day of December, 1939, and a writ of error to said judgment was awarded by this Court on February 26, 1940. On or about the 25th of May, 1940, in Pittsburgh, Pennsylvania, in the absence of any of counsel who appeared in the trial of the case in the circuit court, and certainly without the knowledge of her counsel, proponent entered into an agreement with the contestants, by which she, in effect, waived her rights under the will in question and agreed to share the estate as one of the testator's heirs-at-law. There is no evidence that counsel for the contestants, who appeared in the circuit court, had any knowledge of this agreement at the time it was executed.

Subsequent to this agreement a petition was filed by the contestants, defendants in error, asking that the writ of error granted by this Court be dismissed; whereupon counsel, who appeared for the proponent of the will in the circuit court, filed an answer asserting a contract between the proponent and themselves, by which they were to be paid a definite percentage of the amount which the proponent would receive should the said will be probated, and the estate of the said Werkman thereby pass to her. Counsel for proponent request that they be permitted to prosecute this writ of error for their own benefit and protection.

We are of the opinion that counsel are within their rights in asking that this case be determined upon its merits. According to the allegations of the answer filed by her counsel, the contract entered into with proponent entitled them to one-third of the Werkman estate should the will in question be upheld by a final decision of this

Court. The agreement entered into by the proponent and the contestants provides for a division of the estate into six shares, making it obvious that the amount proponent will receive under this agreement will be one-half of that which her counsel would be entitled should the entire estate pass to her under the conditions above mentioned. In *Burkhart* v. *Scott,* 69 W. Va. 694, 72 S. E. 784, it was held: "An attorney who has brought a suit, pursuant to an agreement that he is to have a certain percentum of the judgment that shall be recovered, as his fee for services, has an inchoate right in the chose in action and may avoid a collusive settlement made between the defendant and his client for the purpose of defeating his fee", and it was held that the attorney was entitled "to have the case proceed to final judgment in the name of his client, for his own benefit". In *State ex rel. Showen* v. *O'Brien, Judge,* 89 W. Va. 634, 109 S. E. 830, the claim of an attorney for services is referred to as a lien against the fund recovered, and it was held that a fraudulent settlement would be ignored. In *Mirasola* v. *Rogers,* 120 W. Va. 685, 200 S. E. 30, a collusive settlement was held not to interfere with the right of an attorney to have his contract for services enforced. Code, 30-2-15 provides that: "An attorney shall be entitled for his services as such to such sums as he may contract for with the party for whom the service is rendered * * * ." We think the agreement between the litigants in this proceeding comes within the rule announced in the cases cited, and that said agreement was a collusive one, amounting to constructive fraud, and from which an inference may be drawn that its execution was intended to operate as an evasion of the terms of the contract entered into between the proponent and her counsel. It may be that the contestants were not advised of the terms of the contract between proponent and her counsel, but they did know that counsel had rendered services in connection with her effort to probate the will, both in the courts of Brooke County and in this Court, and they are held to knowledge that the law gave counsel the right to compensation out of any fund which the proponent might receive

in the event the will should be admitted to probate. Under such circumstances we think counsel is entitled to have this case heard upon its merits, under the ruling in *Burkhart* v. *Scott, supra,* and *Kellogg* v. *Winchell,* 51 App. D. C. 17, 273 Fed. 745, 16 A. L. R. 1159.

A decision of the case on its merits requires a statement of the background leading up to the execution of the two wills in question, as well as the attitude, acts and conduct of William M. Werkman after the death of his wife. The wife, when a young girl, gave birth to the child who is now Ethel C. Kaltenbach, proponent of the Werkman will. This was in 1893. Shortly thereafter, the mother married an elderly man by the name of Beckett, not the father of proponent, who died some years later, and from whom she received some estate. In 1902, she married William M. Werkman, who, it appears, probably had knowledge of the birth of this child. The child had, in the meantime, and when less than one year of age, been legally adopted by Charles and Jennie Swearengen, who resided in Steubenville, Ohio. After the marriage of the Werkmans, when proponent was about twelve years old, a question arose between the Swearengens and Mrs. Werkman as to the custody of the child, the Swearengens believing that Mrs. Werkman was making an effort to take the child from them. They were reassured on this point at a meeting in the Werkman home in Wellsburg, Werkman telling them that so long as they were able to take care of the child she would not be taken from them, but that if the time came when they could not properly care for her, or if anything happened to them, he, Werkman, would take her. After this there does not seem to have been any discord between the two families and the child was permitted to visit the Werkmans until her marriage at an early age. The evidence is that during all these years William M. Werkman evidenced an affection for the child, and this is not seriously controverted, nor is it controverted that Ethel C. Kaltenbach is the child of Rose Werkman. The proponent contends that while William M. Werkman had this affection for her, his feeling for his

own relatives was not cordial; that he had no affection for them; and that he frequently stated that his brothers and sisters would not get any of his property. These contentions are disputed, and there is evidence that during the life of Rose Werkman she corresponded with at least one of these relatives, and that one of them attended her funeral, and another visited Werkman during his last illness. After the death of his wife, William M. Werkman continued his interest in her daughter, made expensive gifts to her, made an extended trip to Virginia with her, and asked her to give up her position in Wheeling and come to his home, and take charge of his house. When he became ill early in 1939, he relied on her for care and attention, in an increasing measure. She accompanied him to the hospital and he directed that should anything happen to him she should be notified. We think the evidence justifies the holding that Werkman was undoubtedly attached to his wife's daughter, the proponent, and that he was indifferent to his own kindred. Further than this we do not think it necessary to go.

The evidence clearly shows that prior to 1936, Rose Werkman made a will by which she devised her estate to her husband. It is probable that William M. Werkman also made a will, but if so its provisions are unknown. The record shows that the former will of Rose Werkman was, in respect to its formal execution, an independent act on her part, being executed and witnessed in the absence of her husband, and so far as known without his knowledge. This will, and possibly the will of William M. Werkman, was placed in a safety deposit box in the City of Wellsburg, and was blurred or defaced by the flood of 1936. It was after this flood that the two wills were executed in April, 1936, and Mrs. Werkman soon thereafter stated that she and Mr. Werkman "had executed new wills."

That they did formally and legally execute these wills is beyond question. On the 23rd day of April, 1936, they, together, went to the banking room of the Wellsburg Banking & Trust Company, and each of them had a typewritten will, almost identical in terms, although not en-

tirely so. The evidence, we think, shows that both of these wills were written on an old-fashioned, double-keyboard typewriter, the product of which carried marked peculiarities, and there is a strong inference that the actual writing of the wills was done by Mr. Werkman, who was a one-armed man and who followed certain peculiar methods in the preparation of typewritten manuscript. Be this as it may, when Werkman went into the bank he stepped to the counter that divided the lobby of the bank from the working quarters and asked W. M. George and Martha Noland, employees of the bank, to witness his will. He then signed the same in their presence, and at his request they affixed their signatures thereto, in his presence, and in the presence of each other. At this time his wife was standing nearby, and there is evidence that she held the will in place on the counter when Werkman signed the same. When the transaction had been completed as to the William M. Werkman will, his wife stepped to the counter and signed her will, and the same was witnessed in due form and by the same witnesses. While the papers so executed and witnessed were separate papers, and the execution and witnessing thereof were separate transactions, it is clear that both Werkman and his wife were in position to know, and probably did know, what the other was doing. When the execution of the wills was completed, they were handed to the respective parties who executed them, and they then left the banking room together. Immediately thereafter they rented a safety deposit box in Wellsburg in their joint names, and it is assumed that the wills were placed therein. Upon the death of Mrs. Werkman her will was probated, and upon the death of William M. Werkman, his will was found in this safety deposit box, and it was withdrawn therefrom by Ethel C. Kaltenbach, who, it is argued, must have been advised by Werkman of its being there. It is in evidence that after the death of his wife, Werkman frequently opened this safety deposit box, from which it is contended that he did not intend to revoke this will, but, evidently intended that it should remain operative and take

effect upon his death. It is also contended that, being an attorney-at-law, it must be assumed that he had knowledge of the legal effect of allowing this will to remain unrevoked; while, on the other hand, it is argued, with equal force that he had the right to assume that the death of his wife rendered said will inoperative.

The trial court refused to probate the will on the basis of the holding of this Court in *Wilson* v. *Starbuck,* 116 W. Va. 554, 182 S. E. 539, 102 A. L. R. 485. In that case it was held that, "where separate wills are made between husband and wife under such circumstances as to evidence that they were made pursuant to a contractual understanding, and by the terms of the wills it is apparent that their sole purpose was to make the survivor the sole beneficiary of the first to die, the death of one renders inoperative the will of the survivor." In that case Peter Cales and Amanda V. Cales went to the office of an attorney in the City of Hinton, where they both resided, and there executed wills, to all intents and purposes identical, in which each was made the sole and absolute beneficiary of the entire estate of the other. Amanda V. Cales died before Peter Cales, and upon his death both wills were presented for probate. Probate was contested upon the ground that these wills were mutual and reciprocal, and made pursuant to a contract based upon adequate consideration, and that the sole purpose was to make the survivor the beneficiary of the one who died first, and that this condition was satisfied upon the death of Amanda V. Cales, leaving the will of Peter Cales not revoked but inoperative. The Court sustained this contention, holding that the circumstances shown by the evidence, in addition to the execution of the wills, were sufficient to establish the contractual relationship, and put them on a parity with a single joint will. However, care was taken to point out that the wills alone were not sufficient, and that there were no declarations or recitals in the wills sufficient, to establish the existence of a contract for their execution, and it was stated that, "the general rule is, undoubtedly, in cases of mutual, but not joint wills, that the

making of the wills themselves, although evidential of the contractual relationship, is insufficient to establish that relationship. The wills before us, with nothing more than their due execution shown, undoubtedly would fall within that rule."

No attack is made upon the holding of the Court in *Wilson* v. *Starbuck,* and it is apparently accepted as sound law. But it is insisted by counsel for proponent that the circumstances developed by the evidence in the case at bar do not establish the contractual relationship which was there held to exist. In that case the parties executing the wills were well advanced in years and had been recently married, and each of them had children by previous marriages, and all the circumstances, it was held, indicated an agreement between them that their estates should go to the survivor. In the case at bar it is said that all of the circumstances indicate an intention on the part of William M. Werkman to have his will remain operative after his wife's death. It is contended that his assumed knowledge of the effect of permitting the will to remain among his private papers in the safety deposit box, his frequent visits to this box, his known affection for and interest in Ethel C. Kaltenbach, and his indifference to his own kindred, all show that it was not his intent that his will, solemnly executed, should become inoperative upon the death of his wife, and that his acceptance of his wife's estate under her will, together with the failure to destroy or revoke his own will, indicates that he intended that his own estate, together with what he had inherited from his wife, should go to the proponent.

We hold that these contentions must be sustained. In the first place, we need do no more than state the rule governing wills, their construction and operation: "The fundamental rule in the construction of wills is, that the intention of the testator, if not inconsistent with some established rule of law, must control." 9 Michie's Digest, Va. and W. Va. Reports, 1101, and cases there cited. We perceive no reason why the rule thus announced with respect to the construction of a will should not prevail and

govern in determining whether or not a person intended a paper he had executed to operate as his will, which might in some cases involve the question of its revocation.

With this rule before us for our guidance, we are confronted with a solemnly executed will, legal in all respects, which disposes of the entire estate of the testator. The death of the wife between the date of the execution of this will and the death of the testator did not operate as a revocation of the will, but only created a situation provided for by Code, 41-3-3, relating to the lapsed devises and legacies. Therefore, if the will is to be held inoperative, it can only be so held on the ground that his will and that of his deceased wife were, in effect, a joint will, executed in pursuance of a contract, as was held to be the case in *Wilson* v. *Starbuck, supra.* This being true, the burden of establishing such contract rests upon the contestants, and this burden can only be sustained by evidence and circumstances outside of the wills, which, taken with the wills, are sufficient to establish the contractual relationship. The wills alone are not sufficient. To establish such relationship requires first and fundamentally that each of the parties knew what was contained in the will of the other. The record before us fails to show, except by inference, that Rose Werkman had any knowledge of the contents of the will of her husband. We may surmise that she did, and the proof strongly supports the theory that the husband had such knowledge as to both wills, because the will of the wife was probably typewritten by him. From this inference we are asked to find that, based thereon, the wife must have had such knowledge, and that the two wills must, in effect, be held as joint and to come within the holding of *Wilson* v. *Starbuck.* Under the circumstances of this case, we find ourselves unable to go this far.

However, if the mere fact of the execution of the two wills in the case before us, even if knowledge of the contents of each may be imputed to the testators, is not alone sufficient to establish an agreement to execute the same,

as stated in 69 C. J. 1303-4, and supported by *Rolls* v. *Allen* 204 Cal. 604, 269 Pac. 450, and *Flower* v. *Flower*, 32 Ohio App. 350, 166 N. E. 914, then how may we, having in mind the fact that the intent of the testator is the controlling factor, find that William M. Werkman intended that his will, legally executed and not revoked by his own act or otherwise, should not operate at his death? There is no claim that his will was revoked, although it appears that he had opportunity to do so. Fifteen months elapsed between the death of his wife and his own decease, during most of which time he was apparently in good health, as we find him making trips out of Wellsburg, his home. The amicable and even affectionate relationship between him and the proponent continued, and probably grew closer, particularly when affliction came, and he turned to her rather than to his own kindred and made her his confidante and principal, if not sole, reliance. It seems useless to further stress this point. Everything indicates a deep interest in and affection for the proponent on the part of the testator. On the other hand, it is not necessary to hold that he had an aversion to his own kindred. It is sufficient to say that the relations between them were not close, and the evidence of the statements of the testator to the effect that he did not intend them to receive any of his estate cannot be ignored. We think it improbable, under the circumstances developed by the record, that the testator intended that all of his estate, including that derived from his wife under her will, should go to his kindred, and that the child of his wife, for whom he had this deep affection, should be deprived of any interest whatever in his estate and that of her mother. We think the probabilities strongly rest with the proposition that, with knowledge of the legal consequence of allowing his will to become operative at his death, he purposely refrained from revoking the same. To hold otherwise would be to resort to inferences and presumptions which we do not think the evidence and circumstances warrant.

This is not a case where we are, primarily, overruling the trial court on a finding of fact. The important facts

are not in dispute. We think that the trial court, in applying the principles announced in *Wilson* v. *Starbuck* to the facts of the present case, failed to give proper weight to what we consider are the clear distinctions between the two; and on this ground we base our decision.

It follows that the judgment of the Circuit Court of Brooke County is reversed and the case remanded for further proceedings.

*Reversed and remanded.*