Ruth Turner *et al.*

*v.*

J. O. Theiss, Executor, *etc.*, *et al.*

(No. 9781)

Submitted April 16, 1946.    Decided May 21, 1946.

*Handlan, Garden, Matthews & Hess* and *Walter F. Ball,* for appellant.

*Fitzpatrick, Strickling & Marshall* and *W. J. Brennan,* for appellees.

Lovins, Judge:

Appellant, Wetzel County Hospital Association, one of the defendants below, appeals from a decree of the Circuit Court of Wetzel County, ordering the specific enforcement of a testamentary agreement, allegedly made

by M. H. Willis, and his wife, Anita Willis.

M. H. Willis, a lawyer of New Martinsville, West Virginia, and former judge of the second and fourth judicial circuits of this State, died April 17, 1938. At the time of his death, he possessed an estate appraised at approximately nineteen thousand dollars, which, by his will dated February 5, 1938, was directed to be disposed of as follows:

"Second. Should my beloved wife, Anita, survive me, I give, devise and bequeath all my Estate, real and personal, to my said beloved wife, Anita, in fee simple and absolutely."

The third item of his will provided that in the event his wife, Anita, should not survive him or in the event it would be impossible to determine whether he or his wife died first, his estate should be disposed of as follows: (a) One-half undivided interest therein should go to Willis Gormley, or to the issue of Willis Gormley, in the event he should not survive testator; (b) one-fourth undivided interest should go to Emma Frances Whitney, or in the event Emma Frances Whitney should not survive testator, the said one-fourth undivided interest should go to Ruth Turner or the heirs of Ruth Turner; and (c) one-fourth undivided interest should go to Ruth Turner, or, in the event Ruth Turner should not survive testator, to the heirs of Ruth Turner.

At the same time Judge Willis executed his will, his wife, Anita Willis, executed a will identical in context except for the inversion of the respective names of M. H. Willis and Anita Willis, and necessary corrections for gender.

Subsequent to the death of M. H. Willis, Anita Willis caused the probate of her husband's will and accepted all the benefits thereof. On March 3, 1939, Mrs. Willis made another will, which provided for substantially the same disposition of her entire estate, as set forth in her will of February 5, 1938, except: (1) She inserted a proviso leaving the one-half undivided interest intended for Willis Gormley to Emma Frances Whitney and Ruth

Turner in the event Willis Gormley should not survive her or leave issue surviving her; (2) she provided for the removal of the body of their child from West Union, West Virginia, to the Willis family burial plot in New Martinsville, West Virginia; and (3) she named Paul J. Shiben in the stead of her deceased husband as executor of her will.

In the spring of 1943 at a time when Mrs. Willis was intermittently confined to her bed by reason of a cancerous condition, which subsequently caused her death, she expressed a desire to change her will, and requested her physician to write a letter to Paul J. Shiben, an attorney, and scrivener of her two wills mentioned above, and obtain advice as to the best method of effecting these changes. Shiben replied, advising that she could execute a different will, either in the legal "form" of her present will, or in holographic form. Acting on this advice, Mrs. Willis executed a holographic will on April 12, 1943. The will dated April 12, 1943, changed the disposition of her estate as made in the other two wills, bequeathed nominal sums only to Ruth Turner and Cammie Lemon, mother of Willis Gormley, as well as similar sums to be paid to specific charities and friends; and the residue and bulk of her estate was therein bequeathed and devised to the Wetzel County Hospital Association, appellant herein.

On June 7, 1943, Mrs. Willis died, leaving an estate appraised slightly in excess of twenty-nine thousand dollars, which consisted principally of the property she received as beneficiary of her husband's will, but considerably augmented by increases in appraised values. Immediately thereafter the holographic will of April 12, 1943, was probated and defendant, J. O. Theiss, was duly appointed executor thereof.

Shortly thereafter this suit in chancery was instituted by Ruth Turner and Willis Gormley, the only surviving beneficiaries of the wills of M. H. Willis and Anita Willis, dated February 5, 1938, and naming as parties defen-

dant the executor and the various beneficiaries of the will of April 12, 1943. The bill alleges that the wills of February 5, 1938, were mutual and reciprocal and were made pursuant to a testamentary agreement, entered into between M. H. Willis and Anita Willis, and providing for the final disposition of their combined estates. The bill further alleges the irrevocability of the wills after the death of M. H. Willis, and, therefore, prays that the entire estate of Anita Willis be impressed with a trust in favor of plaintiffs. After extensive hearings, the trial court sustained the contentions of plaintiffs and entered a final decree containing such provisions and requirements as it deemed necessary to effectuate the granting of the prayers of the bill, and assessed the costs of the suit against the estate. It is from this decree that Wetzel County Hospital Association appeals.

Appellant assigns twelve points of error, but the issues raised thereby may be summarized: (1) Was there, in fact, a valid testamentary agreement made between M. H. Willis and Anita Willis, pursuant to which they executed their respective wills of February 5, 1938; and (2) if so, was the agreement obligatory and binding upon Anita Willis after the death of M. H. Willis and her acceptance of benefits under his will?

From a practical standpoint, the answer to the first of these questions is controlling. A negative answer thereto necessarily precludes consideration of the second question, for wills, unaffected by other circumstances, are ambulatory and subject to revocation or change by the maker at any time. If an affirmative answer is made to the first question, it follows that acceptance by Anita Willis of the benefits conferred by her husband's will calls for an affirmative answer to the second question. In the latter instance the decision must rest, not on a question involving wills, but on well settled principles of the law of contracts. "A contract to make a will is controlled by the same rules and principles and enforceable as other contracts." *Jefferson v. Simpson,* 83 W. Va. 274, 98

S. E. 212; *Davidson v. Davidson,* 72 W. Va. 747, 79 S. E. 998. See *Tearney v. Marmiom,* 103 W. Va. 394, 397, 137 S. E. 543. As a necessary corollary to this doctrine, a will actually made pursuant to a valid contract between two persons to execute wills containing reciprocal provisions, becomes binding and irrevocable when the survivor accepts benefits under the will of the first testator to die. *Underwood v. Myer,* 107 W. Va. 57, 146 S. E. 896; *Chitwood v. Collins,* 122 W. Va. 267, 8 S. E. 2d 830; Thompson on Wills, Second Edition, pages 200, 201. Therefore, we will hereafter discuss in some detail evidence relating to the controlling question whether a valid testamentary agreement was actually entered into between M. H. Willis and Anita Willis.

The trial court has resolved the first question in favor of the plaintiffs and found that a valid testamentary agreement did, in fact, exist. Such a finding is obviously one of fact and will not be disturbed by this Court, unless contrary to the plain preponderance of the evidence, or is without evidence to support it. *Johnston v. Terry,* 128 W. Va. 94, 36 S. E. 2d 489. Appellant urges that alleged agreements of this character are viewed by the courts with suspicion, and, to be valid and enforceable, a high degree of proof is required, citing as authority *Davidson v. Davidson, supra; Wilson v. Gordon,* 73 S. C. 155, 53 S. E. 79; and *Edson v. Parsons,* 155 N. Y. 555, 50 N. E. 265.

In the *Davidson* case, the mother of deceased's illegitimate child attempted to impress a trust on deceased's estate, alleging that deceased had promised to provide for her and her child, by will, in the same manner as he would if they were married, on the condition that she would not prosecute bastardy proceedings against him. Proof offered by her was to the effect that deceased loved both the mother and the child and frequently said he intended to marry the mother and see that she and the child were provided for. The contention of the mother was rejected on the ground that a contract definite and

certain in its terms was not clearly established by the proof.

The *Wilson* and *Edson* cases are singularly alike, and the *Wilson* case cites the *Edson* case as authority. In each case, sisters simultaneously executed wills leaving their respective estates to the survivor, and, in the event the maker be the survivor, her estate was to go to a third party. The only proof of a testamentary agreement in each case was the simultaneous execution of the wills themselves. The holdings of the courts in both cases are well expressed in a portion of point 1 of the syllabus in *Edson v. Parsons, supra,* wherein it is said: "* * * but, to invoke the intervention of equity, it is not sufficient that there are wills simultaneously made, and similar in their cross provisions, but the existence of a clear and definite contract must be shown, either by proof of an express agreement, or by unequivocal circumstances."

This Court has adopted this doctrine and has held: "The execution of mutual wills by husband and wife, by which the testator in each devises and bequeaths his or her estate to the other, is not, alone, sufficient to establish a contract * * *". *In Matter of Werkman,* 122 W. Va. 583, 13 S. E. 2d 73. But the provisions of wills are evidence of a contractual agreement between the makers. *Underwood v. Myer, supra.* And where circumstances surrounding the execution of mutual wills, the provisions of which are identical, are such as to give rise to a clear implication that the same were made pursuant to a common understanding, the contractual relationship is sufficiently established. *Underwood v. Myer, supra; Wilson v. Starbuck,* 116 W. Va. 554, 182 S. E. 539; *In Re: Reed,* 125 W. Va. 555, 26 S. E. 2d 222.

In discussing the sufficiency of evidence to prove such circumstances surrounding the execution of the wills so as to conclude that they were made pursuant to a testamentary agreement, the Court of Appeals of New York said: "It is not essential * * * that an agreement should

be established by direct evidence. It may be established from such facts and circumstances as will raise an implication that it was made, and may have reinforcement from the evidence of the conduct of the parties at the time, and subsequently." *Edson v. Parsons, supra.*

In the *Reed* case, this Court, in reaching the conclusion that an agreement existed, stressed the facts that the wills were written and signed at the same time and attested by the same witnesses; that both makers knew the provisions of each other's will; that the text of the wills was the same; and that the instructions and conversations of the parties, at the time they discussed the drafting of their wills with their attorney, were indicative of a prior understanding and agreement. See also, *Wilson v. Starbuck, supra; Underwood v. Myer, supra;* 4 Page on Wills, Lifetime Ed., 930, *et seq.*

In the case at bar testimony regarding circumstances surrounding the execution of the wills of February 5, 1938, is not materially controverted. Paul J. Shiben, scrivener of the wills, was called to the Willis home on February 3, 1938, and was instructed by M. H. Willis, in the presence of Anita Willis, to prepare reciprocal and identical wills for them. He states that he "* * * gained the impression at the time that they both knew what they wanted and that they merely wanted * * * to reflect those provisions in a reciprocal instrument * * *", and that "Judge did most of the talking on that occasion and as he would mention his wishes and the names of the beneficiaries of his will Mrs. Willis would remark * * * that her will was to have the same provisions and the same beneficiaries * * *". From notes taken at the time, Shiben prepared a rough draft of one will, which was read by M. H. Willis, in the presence of Mrs. Willis, and approved by them. The final drafts of the wills were delivered to the Willis home February 5, 1938, where one will was read and various provisions thereof were explained by M. H. Willis. At that time the M. H. Willis will was read in its entirety, but only a portion of Mrs. Willis' will was read, it being explained that the remainder was identical with her husband's will.

Mr. and Mrs. Wade Miller, friends of the Willises, were visiting at the Willis home at the time the wills were executed and heard them read. The Millers substantially corroborate Shiben regarding the reading of the wills. Mrs. Miller added that prior to the signing of the wills, M. H. Willis talked at some length, in which he stated that the wills were rare and unusual; that they were "companion or reciprocal wills"; that "* * * he and Mrs. Willis had given it considerable study and it was their wish that whoever would go first would have the estate, then at the death of the survivor that the remaining estate would be equally divided between his kin and her kin * * *"; and that Willis Gormley was to receive the share to go to his kin, while Mrs. Whitney and Mrs. Turner were to receive the share to go to the kin of Mrs. Willis. Mr. Miller, testifying regarding the same "short talk" by M. H. Willis, said "* * * that he and Mrs. Willis had entered into an agreement whereby the survivor was to receive all of the property of the first to die and at the death of the survivor the remainder of the combined estates to be divided one-half to Judge Willis' kin and one-half to Mrs. Willis' kin." Mr. Miller further stated that at an earlier date, while discussing other matters with M. H. Willis in the latter's office, M. H. Willis had informed him of said "understanding or agreement" regarding the final disposition of the estates of Judge and Mrs. Willis.

Geraldine Workman Robinson, one of the subscribing witnesses to the wills dated February 5, 1938, described the reading and execution of the wills in substantially the same manner as did the Millers. She also states that as M. H. Willis explained the various sections of the wills, Mrs. Willis remarked that they were understood by her, and that they properly expressed her desires. She adds that M. H. Willis remarked that the wills were made pursuant to an understanding which he and Mrs. Willis had made as to the final disposition of their properties, and that Mrs. Willis had then assented to the remark so made. Mrs. Robinson also testified that for a number of

years she had been M. H. Willis' secretary, and that previously he had told her "* * * that he and Mrs. Willis had agreed upon the disposition of their property as disposed of in the wills of Judge and Mrs. Willis that I witnessed."

J. O. Theiss, the Willis family physician, and the other subscribing witness to the wills dated February 5, 1938, testified that Judge Willis would interrupt the reading of the wills with various comments, the import of which he did not recall. He stated that in the explanation made by M. H. Willis prior to the execution of the wills, the faith he and Mrs. Willis had in each other was emphasized, but that M. H. Willis made no mention of an agreement relative to the execution of the wills.

Fred Skinner, a near neighbor and close friend of the Willises, testified that he was a very frequent visitor in the Willis home; that on a number of occasions M. H. Willis had discussed the agreement that he and Mrs. Willis had made with reference to their wills and the final disposition of their estates; that on several of these occasions these discussions had taken place in the presence of Mrs. Willis and she had indicated her acquiescence to and approval of her husband's statements; and that M. H. Willis was aware of the seriousness of his illness and, being anxious to carry out the agreement by execution of the wills, had urged Skinner to influence Mrs. Willis to sign her will, but that Mrs. Willis had procrastinated in doing so, even though she said it correctly expressed her desires.

Considering the testimony as related above, we are unable to say that the trial chancellor's finding of fact with reference to the testamentary agreement was contrary to the plain preponderance of the evidence, or without evidence to support it. On the contrary, after a thorough review of the entire record, we are of the opinion that the decree of the trial chancellor is amply supported by the evidence and is clearly right in finding that the reciprocal wills of M. H. Willis and Anita Willis, dated February 5, 1938, were made pursuant to a testamentary

agreement; that upon the death of M. H. Willis and the acceptance by Anita Willis of the benefits thereunder, her will of the same date became binding and irrevocable; and that the beneficiaries of the wills executed pursuant thereto are entitled to specific performance of the agreement in the manner decreed. *Chitwood v. Collins, supra; Underwood v. Myers, supra.* See *Edson v. Parsons, supra; Wilson v. Gordon, supra; Schauer v. Schauer,* 43 N.M. 209, 89 P. 2d 521; *Stevens v. Myers,* 91 Ore. 114, 177 P. 37; *Allen v. Ross,* 199 Wis. 162, 225 N. W. 831; *Smith v. Thompson,* 250 Mich. 302, 230 N. W. 156; *Canada v. Ihmsen,* 33 Wyo. 439, 240 P. 927; *Frazier v. Patterson,* 243 Ill. 80, 90 N. E. 216.

In brief and oral argument the Wetzel County Hospital Association adverts to the opinions of this Court in *Wilson v. Starbuck, supra,* and *In Re: Reed, supra.* In those cases there were mutual wills, containing reciprocal provisions executed by the husband and wife, under which the survivor, with minor exceptions, took all of the estate of the first to die. In each case the wife died first, and, upon the death of the husband, the heirs and distributees of the wife claimed the estate of the husband upon the theory that the legacies and devises made to the wife in the will of the husband had lapsed, and to which legacies and devises by virtue of Code, 41-3-3, they were entitled. It was held in each case that the object of the mutual and reciprocal wills was to vest the estate of the first to die in the survivor; that having attained that object the will of the survivor became inoperative. The questions presented in the instant case, however, have no relation to lapsed devises or legacies. Moreover, the wills of M. H. Willis and Anita Willis, after devising and bequeathing their respective estates to the survivor thereof, went further and provided that the estate of the survivor should go to certain named kinsmen of both as hereinabove stated. The rationale of the decisions of the *Wilson* and *Reed* cases is clearly different from that in this case. In the *Matter of Werkmen* the same question was presented as that presented in

*Wilson v. Starbuck, supra, and In Re: Reed, supra.* In the *Werkman* case it was reasoned that the burden of showing that the two wills were, in fact, a joint will rested on those who opposed probate of the will of the surviving spouse, and that the proof there tendered was insufficient to establish the joint character of the wills. In this case the agreement made by M. H. Willis and Anita Willis followed by the execution of the wills dated February 5, 1938, conclusively shows that when the survivor died, Willis Gormley, or his issue, should take one-half of the estate of the survivor, and Ruth Turner and Emma Frances Whitney should each take one-fourth thereof, or, if Emma Frances Whitney pre-deceased the survivor, Ruth Turner, or her heirs, should take the share of the said Emma Frances Whitney. Mrs. Whitney having pre-deceased Anita Willis, Ruth Turner now becomes entitled to one-half of the estate of Mrs. Willis. The decisions of this Court in *Wilson v. Starbuck, supra,* and *In Re: Reed* present no impediment to such disposition as made by the wills of M. H. Willis and Anita Willis.

Appellant contends that the third clause of the M. H. Willis will amounts to a limitation over to third parties, and, since it conflicts with the fee simple devises and the bequests of the second clause of said will, it is void. Cases cited would seem to sustain this contention, but in such cases the Court was considering the construction of one will having conflicting provisions. However, here we are not construing the effect of a single will, but enforcing an agreement under the obvious terms of which the third clause of the will was intended to be supplementary to the second clause, and no conflict exists. To approve and uphold an avoidance of the third clause of the will would amount to an avoidance of the testamentary agreement, which, in equity, we cannot do.

Nor does the third clause of the will amount to a restraint on the right of the survivor to alien, in good faith, any part or all of the joint estates. In the absence of a plain intention to that end, expressed in such wills

or in such testamentary agreements, the rights of the makers of such wills to dispose of his or her property in good faith during his or her lifetime is not affected. *Sample v. Butler University*, 211 Ind. 122, 4 N. E. 2d 545; 108 A. L. R. Note, page 867. But a survivor, in bad faith or in fraud of the rights of the beneficiaries of the testamentary agreement, cannot make an unreasonable disposition of his or her property. *Dickinson v. Lane*, 193 N. Y. 18, 85 N. E. 818. The evidence does not show that Mrs. Willis attempted to alien any part of the joint estates during her lifetime. The effect of the holographic will of April 12, 1943, was to abrogate entirely the testamentary agreement she had made with her husband. Consequently such was unreasonable and to the detriment of the beneficiaries of that agreement. Having died seised and possessed of certain property, the testamentary agreement attached thereto, and her estate will be impressed with a trust for the use of the beneficiaries of said agreement.

Willis Gormley and Ruth Turner make cross-assignment of error predicated on that part of the decree adjudicating that the costs of this suit should be paid out of the estate of Anita Willis by her executor. The allowance of costs in chancery cases is within the sound discretion of the chancellor, but that discretion is reviewable. *Solins v. White*, 128 W. Va. 189, 36 S. E. 2d 132; *Traugh v. Hart*, 113 W. Va. 338, 168 S. E. 137. It is to be borne in mind that the last will and testament of Anita Willis and the probate thereof are not challenged by this suit. The plaintiffs place their reliance on the testamentary agreement. We can see no reason to require the payment of the costs of this suit out of money or property to which the plaintiffs are clearly entitled, they being the successful litigants in the trial court. Therefore, we are of the opinion that the trial chancellor abused his discretion in adjudicating costs against the estate of Anita Willis. We therefore modify the decree of the chancellor in so far as the costs of this suit were decreed to be paid by the executor of the estate of Anita

Willis, and hold that said costs shall be adjudged against the Wetzel County Hospital Association. As modified the decree is affirmed.

Judge Fox is of the opinion that the trial chancellor did not abuse his discretion and would affirm the decree without modification.

*Modified and affirmed.*