DEAKINS et al. v. WEBB et al. No. 1.—84 S. W. (2d) 367.

Eastern Section.    November 3, 1935.

Petition for Certiorari denied by Supreme Court, June 10, 1395.

Keebler & Woolsey, of Bristol, for appellants.

W. D. Lyon, of Bluff City, for appellees.

PORTRUM, J. On April 5, 1931, Henry D. DeVault died intestate in Sullivan county, Tenn., leaving about $16,000 in securities, represented by certificates of deposit and other negotiable instruments; he left no descendants, so his next of kin and distributees are his collateral kin. His wife, Mary I. DeVault, predeceased him, having died March 15, 1928. They were married in 1880, more than fifty years ago. At the date of the marriage Mrs. DeVault had some stock and personal property and she received $600 for the sale of land inherited by her from her father's estate. After her death, her husband discovered hidden money, consisting of gold and currency in amount of $1,444.83; he did not know that she possessed this money, and he carried it to a bank and deposited it by taking a certificate of deposit in his name, at the same time he had other money of his there on deposit and he did not consolidate these deposits in one certificate of deposit, but kept a separate certificate of deposit for the money which his wife had hidden before her death. Mr. DeVault had a nephew, H. Clinton Webb, who afterwards qualified as his administrator, in whom he had confidence, and Mr. DeVault, because of his age, finding his business matters troublesome, intrusted this nephew with the management of his affairs. He gave him the following written authority:

"This is to certify that I have on this date given privilege and authority to H. C. Webb to be free to act as my agent in all my personal

business matters, such as writing checks on any banks I have accounts with, and as to any other matters that may arise. This April 25, 1930. (Signed) H. D. DeVault.''

Mr. DeVault had his money deposited in three different banks at different localities, and the first thing that his nephew and agent, Mr. Webb, did was to consolidate these deposits by cashing all of the certificates of deposit, including the one which represented the money found after the death of the wife, and redepositing the entire sum in a certificate of deposit, taken in the name of Mr. DeVault in a bank at Bluff City, his home town. Mr. Webb acted for his uncle upon this authority until the day of the uncle's death in April, 1931, and perhaps attempted to carry out his uncle's directions after his death in the settlement of his estate, but a few months later he regularly qualified as the administrator of the estate.

A few days more than three years after the death of Mr. DeVault, the complainants, who are the heirs at law and distributees of Mrs. Mary DeVault, filed this bill for the purpose of recovering a part of Mr. DeVault's estate upon one or more of the following theories alleged in the bill:

(a) That since Mrs. DeVault died intestate, and her husband had recognized her ownership of her funds which he had not intentionally reduced to his possession, then under the law her estate passed to her next of kin and distributees, and they are entitled to recover them from the administrator.

(b) That Mr. DeVault did not die intestate, but in fact had executed a will giving to Mrs. DeVault's kin one-half interest in his estate, and this will was mislaid, destroyed, or lost, and the complainants are entitled to set it up and have it probated.

(c) That Mr. DeVault in his lifetime established a voluntary trust in favor of his wife's kin in one-half of his estate, and that the complainants are entitled to have the trust declared and enforced.

(d) That Mr. DeVault declared a voluntary trust of the funds belonging to his wife and directed his agent, Mr. Webb, to pay the funds over to the beneficiaries, and the complainants are entitled to have this trust agreement set up and enforced.

(e) And ''said funds and property belonging to the said Mary I. DeVault were held and treated by the said Henry D. DeVault during the life of the said wife as her separate property and estate, and that after her death it was held and treated by the said deceased as a trust fund in his hands for the use and benefit of the heirs at law of the said Mary I. DeVault.''

After the hearing, the Chancellor dismissed the bill.

(a) It seems to be the theory of the appellant that since the husband recognized the ownership of his wife in the personal property described, and did not reduce it to his possession prior to the act emancipating women, enacted in 1913, then the personal

property belonging to the wife at the time of her death passed under the law to her next of kin and distributees to the exclusion of her husband. At common law, it was necessary for the husband to reduce to his possession his wife's personal property during her lifetime to perfect his title to it, but upon her death intestate he inherited her personal property, and, of course, this right of inheritance had no reference to her personal property which he had already acquired title to by reduction to possession. He inherited the property which he had failed to reduce to his possession, and this to the exclusion of her next of kin, by reason of his marital relationship. Baker v. Dew, 133 Tenn., 126, 179 S. W., 645; American Surety Company v. Grace, 151 Tenn., 575, 577, 271 S. W., 739; Eblen v. Jordan, 161 Tenn., 509, 33 S. W. (2d), 65. (Since the passage of the act of 1929, carried into the Code 1932, section 8389, the husband takes under the statute of distribution to the exclusion of the wife's collateral kin.)

(b) The evidence does not clearly establish the existence of a formally executed written will; the testimony shows that Mr. DeVault stated that he at one time made a will in favor of his wife, but since her death it was necessary that he make another disposition of his estate. And there is some testimony indicating or stating that he said that he had made another disposition of his estate. But there is testimony that Mr. DeVault said upon his deathbed that he had not executed a will. The appellants' testimony taken alone is insufficient to establish a lost will. Even had they proved a formal execution of the will, and since it was not found among his papers at his death, then the presumption of law is that he revoked it. The burden was upon the appellant to show that it had not been revoked, and there is no evidence overturning this presumption. Wolfe v. Williams, 1 Tenn. App., 441. There is no convincing evidence that Mr. DeVault ever executed a formal will.

(c) There is not sufficient evidence showing that he ever anticipated or intended to give his wife's people one-half of his estate; and there is no proof showing that he ever directed his agent, Mr. Webb, to pay over one-half of his estate to his wife's relatives. There is nothing indicating the establishing of a voluntary trust to one-half of his property. His purpose to make a different disposition of his property negatives this idea.

(d) and (e) Mr. DeVault did express an intention to give to his wife's people the money which he had recognized as her money, especially the $600 which was derived from the sale of her father's land, which she received. But we think this is an expression of a future intention, and he did not constitute himself a trustee to hold the funds for the benefit of his wife's kin. If there were any recognition of a trust by Mr. DeVault, it was after

the appointment of his nephew as his agent and it arose out of the directions given him in the disposition of the funds. There is evidence to establish this intention, and the directions given the agent, for the agent, Mr. Webb, himself testified upon these questions; we quote the pertinent portion of his testimony:

"On Monday morning before he died on Saturday I was alone with him and he called me to his bedside and there was no one in the room except my uncle and me, and he began to tell me what he wanted done, and he talked on awhile, and I thought he had a will until that morning. I thought he was telling me there so I would be more familiar with the will when I came into possession of it. So he told me about how he wanted to be put away, even what kind of casket he wanted, and he talked on quite a while and I said 'Uncle Henry, is there anything here that you want Aunt Mary's folks to have?' and he said when Molly died that Lizzie gave her folks some furniture and bed clothes, and I said 'Is that all you want Aunt Mary's folks to have?' and he said that Aunt Mary got a little from her home, $400 or $500, and said that Maggie Miller would know the amount of it, and all he knew to do was to get the amount from her and figure the interest at 4% and distribute it among the Deakins' heirs. I said 'You have that in your will?' and he said he had no will, and I told him I did not believe the law would let me do that, and he said it did not make any difference anyway, and he guessed it took about that much to put her away, and after that I could not get him back on that subject as to what to do for the Deakins' heirs. I tried that day to get him to make a will and told him I would gladly get somebody to come to make it for him, but he would not want to do that, and I tried then to get him to make a verbal will in someone presence, but he would not do that."

After Mr. DeVault's death, Mr. Webb did make inquiry to determine how much the land sold for, in order to calculate the interest and determine how much was going to Mrs. DeVault's heirs. He wrote letters of inquiry to determine this question. His future conduct and present interest must be taken in connection with his self-serving statements, and we think it is clearly established that Mr. DeVault intended that Mr. Webb should ascertain this amount and distribute it as he had directed him. We think if Mr. DeVault had abandoned this purpose, as this witness' testimony indicates, then the witness would not have followed the course of conduct he pursued after the death of Mr. DeVault. So it only remains to be determined if these directions and this purpose amounted in law to a voluntary trust which a court of equity will enforce.

"It is well settled, that the 7th section of the Statute of Frauds, 29 Charles 2, chapter 3, applies only to 'lands and tenements, and

hereditaments.' The law, in regard to personal chattels, remains wholly unaffected by the statute; and a valid trust of personal property, may not only be created, but may also be established and proved by mere parol declaration. [Citing authorities.]

"It is essential, however, to the creation of a trust by parol declarations, that the expressions used should amount to a clear and explicit declaration of trust. The subject matter of the trust, as well as the object of the trust, must be pointed out with certainty: Hill on Trustees, 75. If the trust be purely voluntary, it will not be enforced against the donor, upon a mere parol declaration, unless a complete executed trust be clearly proved [citing authorities]; but it is well settled, that a trust, once effectually created by parol, and fully executed, cannot subsequently be extinguished, revoked, or altered by the party creating it, any more than a more formal assurance; . . . nor can it be affected by any subsequent declarations of the donor [citing authorities]." Harris v. Union Bank of Tennessee, 41 Tenn. (1 Cold.), 152.

"The perfect or completed trust is valid and enforcible, although purely voluntary. A voluntary trust which is still executory, incomplete, imperfect, or promissory, will neither be enforced nor declared. In order to render the voluntary trust valid and effectual, the party creating it, either by direct transfer or by declaration, must have done everything which, according to the nature of the property comprised in it, was necessary to be done in order to transfer the property and render the transacting binding upon him. A person holding property, real or personal, and intending to make a voluntary disposition thereof for the benefit of another, may do so in either one of three modes: 1. He may make a simple conveyance or assignment of it directly to the donee, so as to vest in the latter whatever interest and title the donor had without the intervention of any trust; 2. He may make a transfer of it to a third person upon trust declared in favor of the donee; 3. He may retain the title and declare himself a trustee for the donee, and thus clothe the donee with the beneficial estate. In neither of these modes, if the transaction is imperfect and executory, equity will not aid nor enforce it; and if the intention of the party is to adopt one of the methods, a court of equity will not resort to either of the other methods for the purpose of carrying it into effect. Whenever the party intends to make a transfer directly to the donee, he must do all that is necessary, according to the nature of the property, to pass and vest the title, by valid conveyance in case of real property, and by valid assignment in case of personal property, and generally accompanied by an actual delivery of chattels and things in action where the donor is the legal owner. Where the donor shows an intention to adopt this first method, and thus invest the property directly in the donee, and the act of donation

is simply an assignment of any form, but is imperfect so that it does not pass the title, a court of equity will not treat it as a declaration of trust constituting the donor himself a trustee for the donee; an imperfect voluntary assignment will not be regarded in equity as an agreement to assign for the purpose of raising a trust. If a donor adopts the second or third mode, he need not use any technical words, or language in express terms creating or declaring a trust, but he must employ language which shows unequivocally an intention on his part to create a trust in a third person, or to declare a trust in himself. It is not essential, however, that the donor shall part with the possession in cases where he thus creates or declares a trust. These conclusions are sustained by the decided weight of authority, and must be regarded as the settled rules of equity jurisprudence upon the subject." Pomeroy's Equity Jurisprudence, volume 3, section 997, page 2185.

In the case before us there was no attempt to make a formal transfer or assignment, it was not intended to make a formal transfer of the title to the agent as trustee, and the trust must stand, if at all, upon the third ground given by Mr. Pomeroy. The agent is the representative of the principal, and the agent's title is the principal's title, so if the principal has a mind to he can declare a trust in property, the custody or possession of which is in the agent, or he can direct the agent to carry out his trust. In this case the money was represented by certificates of deposit which were in the name of the alleged donor. Did the donor declare a voluntary trust?

"Trusts are also classified as executed and executory, and the distinction between the two classes has been long recognized, although it is not always easy of application. In one sense of the word all trusts may be said to be executory, because there is always something to be done, but this is not the sense in which the terms 'executed' and 'executory' are properly used with regard to trusts; nor has the classification any reference to the effect of the statute of uses.

"An executed trust is one in which the limitations and trusts are fully and perfectly declared. An executory trust is one in which the limitations are imperfectly declared, and the donor's intention is expressed in such general terms that something not fully declared is required to be done, in order to complete and perfect the trust, and to give it effect. The distinction between executed and executory trusts properly so-called therefore depends upon the manner in which the trusts are declared, and the terms 'executed' and 'executory' refer rather to the manner and perfection of their creation than to the action of the trustee in administering the property. The distinction between executed and executory trusts as thus defined and distinguished is recognized by the

decided weight of authority." Trusts, 65 C. J., section 15, page 225.

"In Richards v. Eldridge, L. R., 18 Eq., 11, Sir George Jessel, M. R., said: 'The principle is a very simple one. A man may transfer his property without valuable consideration in one of two ways: He may either do such act as amounts in law to a conveyance or assignment of the property, and thus completely divest himself of the legal ownership, in which case the person who by these acts acquires the property takes it beneficially or on trust as the case may be; or the legal owner of the property may, by one or the other of the modes recognized as amounting to the valid declaration of the trust, constitute himself a trustee, and without an actual transfer of the legal title may so deal with the property as to deprive himself of its legal ownership, and declare that he will hold it from that time forward on trust for the other person. It is true, he need not use the words 'I declare myself the trustee,' but he must do something which is equivalent to it and use expressions which have that meaning; for however anxious the court may be to carry out a man's intention, it is not at liberty to construe words otherwise than according to their proper meaning. . . . 'The true distinction appears to me to be plain, and beyond dispute; for a man to make himself the trustee there must be an expression of intention to become a trustee, whereas words of present gift show an intention to give over property to another, and not retain it in the donor's own hands for any purpose, fiduciary or otherwise.' " (For a full and exhaustive review of the authorities discussing this doctrine, see note to section 997 of Pomeroy's Equity Jurisprudence.)

In this case we are of the opinion that the proof fails to establish an intention on the part of Mr. DeVault to declare a trust, and at the time of his declaration to part with his legal title to the property. We think it his purpose and intention to make a testamentary disposition of his property after his death, and that the intent resulted in an imperfect gift of a portion of his estate. This purpose could be legally effectuated only by the execution of a valid will. "But it is well settled that equity will not interpose to perfect a defective gift or voluntary settlement made without consideration." Young v. Young, 80 N. Y., 422, 36 Am. Rep., 634. As a gift causa mortis, it was not perfect for a lack of a delivery, since a delivery cannot be made by the donor to his agent. Scott v. Union & Planters' Bank & Trust Co., 123 Tenn., 258, 130 S. W., 757.

The appellants quote the following authorities for their position:

"The simplest transaction out of which a trust will be implied is that of money or other property delivered to a person to be by him paid or delivered over for the benefit of the third person.

In such case the trust necessarily arises from the transaction, in favor of the beneficiary though there is no express agreement to that effect.'' 26 R. C. L., p. 1200, and McKee v. Lamon, 159 U. S., 317, 16 S. Ct., 11, 40 L. Ed., 165.

This has reference to an implied trust and not a declared voluntary trust. As far as the donee and the trustee are concerned, the trustee having the property, the law will require the trustee to account to the donee so long as the donor does not intervene to declare the gift void. The law does not raise an implied trust between the donee and the donor simply because the property is in the hands of a trustee.

We are constrained to hold that the courts have no power to carry out the express intention of Mr. DeVault and require his estate to respond, because we are unable to conclude from the evidence that an express voluntary trust was declared. It follows that the decree of the lower court will be affirmed with costs.

Ailor and McAmis, JJ., concur.