PEARSON et al v. McCALLUM et al.—173 S. W. (2d) 150.

Western Section.   June 19, 1941.

Petition for Certiorari denied by Supreme Court, January 17, 1942.

414

416

W. N. Key, of Jackson, and Holmes & Holmes, of Trenton, for appellants.

W. G. Timberlake, of Jackson, for appellees.

KETCHUM, J. The complainants by their bill filed herein on September 9, 1939, seek to have set up and declared an express trust in their favor to the extent of a half interest in the estate, real and personal, of which J. R. McCallum died seized and possessed on March 8, 1938. The complainants are the next of kin and heirs at law of Mrs. Mary Pearson McCallum (also known as Mary E. or Mamie McCallum), the deceased wife of the said J. R. McCallum; and the defendants are the next of kin and heirs at law of the said J. R. McCallum, deceased, and Judge S. J. Everett, as the administrator of his estate, and the American Bonding Company, the surety on his bond as such administrator. The estate had been finally wound up and distributed, and the real estate partitioned between the heirs of said decedent prior to the filing of the bill; so the complainants prayed for a personal decree against the heirs and distributees, as well as against the administrator and his surety for such sum as might be found to be due them.

The complainants base their claim to the relief sought upon a certain paper writing alleged to have been signed

by the said J. R. McCallum and his wife, Mrs. Mary E. McCallum on the — day of January, 1926, or shortly prior to that date, under the terms of which complainants aver it was mutually agreed between them that the estate accumulated by them should at the death of the survivor of them be equally divided between the next of kin and heirs at law of the said J. R. McCallum, on the one part, and the next of kin and heirs at law of his wife, the said Mary E. McCallum, on the other. The said paper writing was not produced in evidence, and the complainants seek to prove its execution, and the existence and contents thereof, by parol testimony.

The defendants by their answers emphatically deny having ever heard of any such agreement, and by appropriate pleas of non est factum, duly sworn to, severally deny the execution of the writing relied upon by the complainants to establish said trust.

It was also averred in the answer that Mrs. McCallum never at any time had any separate estate, or any joint interest with her husband in any property; and that if such an agreement as that alleged in the bill had been executed it would have been without any valid consideration, and a nudum pactum, and in no sense binding upon the said J. R. McCallum; and, therefore, wholly insufficient to create a trust in favor of the complainants as claimed in their bill.

After all the proof had been taken and the cause was ready for trial, the complainants were permitted to dismiss their bill as to the defendant S. J. Everett, administrator, and the American Bonding Company, the surety on his bond. Thereupon the defendants, by leave of court first obtained, filed their amended and supplemental bill in which they set out the proceedings had and

especially alleged that the theory of the complainants' bill was that the decedent J. R. McCallum had died without performing the executory contract to leave one-half of his property to complainants, and that they were therefore entitled to have a recovery for the value thereof from his personal representatives and distributees; and that in the taking of the proof the defendants had objected to all the testimony of the complainants with reference to any conversations and transactions which they or any of them had with the intestate in his lifetime, by reason of the provisions of section 9780 of the code which rendered such testimony incompetent and inadmissible; and had also objected to all testimony relating to agreements and transactions which occurred between Mr. and Mrs. McCallum growing out of or in consequence of their marital relation, by reason of the provisions of section 9777 of the code which rendered all such disclosures privileged and incompetent, and the defendants averred that the personal representative of the said J. R. McCallum was a necessary party to the suit, and that complainants could not by the dismissal of their suit against the said S. J. Everett, administrator, have the benefit of said testimony which was incompetent against the administrator; and that by dismissing their suit against the administrator they had estopped themselves from obtaining any recovery against the defendants J. F. McCallum and Mrs. Annie Everett, the heirs and next of kin of Mr. McCallum.

On the hearing the chancellor dismissed the bill and the complainants have appealed.

Mr. and Mrs. McCallum were married on May 13, 1880. They had only one child, which died in infancy. Mrs. McCallum died on November 10, 1932. She owned no

property in her own name and left no debts, and there was no necessity for an administrator on her estate. Mr. McCallum died suddenly as the result of an automobile accident on March 8, 1938; and, as already stated, Judge S. J. Everett, who was his brother-in-law, was appointed and qualified as administrator of his estate. His real estate consisted of a farm of about 170 acres in Madison County, near Beech Bluff, and three stores in the city of Jackson. Each of these properties was estimated to be worth from $8,000 to $10,000. His personal estate consisted almost entirely of cash in bank, United States bonds, and a few promissory notes. He owed practically no debts, and, as already stated, the estate was entirely wound up and final distribution was made; and the administrator and his surety were discharged at the end of a year after his appointment. The real estate was also partitioned between the heirs, Mr. J. F. McCallum taking the 170 acre farm and Mrs. Everett the three stores in Jackson.

It is the contention of the complainants that this estate was accumulated as the result of the joint industry, frugality and economy of Mr. McCallum and his wife, and from the moneys received by her as gifts and by inheritance from different members of her family; and that he always recognized her interest in their property and savings; and that for many years prior to the execution of the written agreement it had been understood and agreed between them that upon the death of the survivor of them the estate accumulated by them would be equally divided between his heirs and next of kin on the one part and her heirs and next of kin on the other.

Mrs. McCallum received about $1,000 as a gift or advancement from her father soon after her marriage;

and inherited $800 to $1,000 from her grandmother a few years later, and about $200 from her father's estate about 1912; and $94.73 from her aunt, Mrs. Hailey, about 1929. All of this money was apparently turned over to her husband.

In February, 1881, Mr. McCallum purchased from Mrs. Hailey a tract of land known as the Berry place for the sum of $2,800, and he and his wife resided on this place for some years thereafter. The title to this place, as well as the title to all the other real estate afterwards purchased, was taken in the name of Mr. McCallum. It is claimed that the $1,000 given to Mrs. McCallum by her father went into the purchase of this place, and this is doubtless true. When the Berry place was sold Mrs. McCallum joined in the deed for the purpose of relinquishing her homestead and dower.

Mr. and Mrs. McCallum were industrious, and lived frugally and economically. He was a successful farmer, and was for a few years also interested in a mercantile business. He and his wife were most congenial and lived together happily as husband and wife for more than 52 years; and his relations with her brothers and nephews and nieces were always cordial and friendly.

The written agreement upon which the complainants rely to establish the trust was never produced; and the only testimony offered to prove its execution and contents is the testimony of N. B. Pearson, a brother of Mrs. McCallum, and his son W. D. Pearson. The substance of their testimony is that in January, 1926, while the McCallums were having their house remodeled, Mrs. McCallum spent a week at N. B. Pearson's home, and while there showed the agreement to her brother N. B. Pearson and his wife and son, and read and discussed

it in their presence, and then handed it to Mrs. Pearson (who is now dead) to look at, remarking that they could see that she and Mr. McCallum had both signed it; and that Mrs. Pearson then handed it back to her, and that Mrs. McCallum took it into her room and put it into her grip. They testified that the paper was written in pencil on ordinary ink tablet paper about 8 by 10 inches in size, that Mrs. McCallum read it, or the material part of it in their presence, but that they did not have it in their hands.

They testified that the agreement provided in substance that upon the death of the survivor of them their property would be equally divided between Mr. McCallum's heirs, on the one side, and Mrs. McCallum's heirs, on the other; that it first provided that Mr. McCallum's brother J. F. or Fenner McCallum should have the 170 acre farm, and that his sister, Mrs. Everett, should have the three brick stores in Jackson; next that the fair value of these two properties should be paid to Mrs. McCallum's heirs; and then the remainder should be divided equally between Mr. McCallum's heirs, on the one part, and Mrs. McCallum's heirs, on the other. Mr. McCallum was not present on this occasion.

Mr. N. B. Pearson further testified that about a month later he and his wife were at Mr. McCallum's home and that they and Mr. and Mrs. McCallum were sitting around the stove, and that he again saw this instrument, but did not have it in his hands, and that Mr. McCallum heard what his wife said (but the witness did not say what she said); and that about two years later when he and his wife were at Mr. McCallum's, Mrs. McCallum said in the presence of Mr. McCallum that they had bought some bonds that would be "added to that agreement," and

that the bonds had been left with Mr. Wilkerson at the Bank of Commerce.

N. B. Pearson also testified that about five years before the execution of the written agreement he heard Mrs. McCallum tell their brother J. C. Pearson (since deceased) that she and Mr. McCallum had agreed that they "would divide their property equally among her people and Mr. McCallum's people."

Mrs. Gieula Pearson Exum, a niece of Mrs. McCallum, also testified that she saw this written agreement in January, 1926; that Mrs. McCallum had been at "Uncle Bunny's" (Mr. N. B. Pearson), about a week, and was sick, and that she took her home with her, and put her to bed, and that Mrs. McCallum told her that she wanted to talk with her; and that she asked for her grip and took a paper out of it and said: "Gieula, Uncle Bob and I are getting old, and we decided before we left home we had better make an agreement so if anything happened to either, the other would understand how we wanted things to go," and that she opened the paper and said: "See here, this agreement, we both have signed it. Take it and put it away."

Mrs. Exum says she did put it away, that she saw the signatures of Mr. McCallum and Mrs. McCallum on it, but that she did not read it or hear it read; that she kept it for about a week, until Mr. McCallum came, and that he asked Mrs. McCallum for it, and that Mrs. McCallum told her to get it and give it to him, which she did, and that she never saw it again after that.

The chancellor excluded the testimony of N. B. Pearson and his son W. D. Pearson as to the execution of the paper and as to its contents as hearsay, and because Mr. McCallum was not present when it was read to them, and

upon the ground that it would not have been competent
for Mrs. McCallum herself to testify thereto because the
testimony related to matters that occurred between her
and her husband in consequence of their marital relations,
and was prohibited by section 9777 of the code.

Mrs. McCallum had a stroke about September, 1932,
and was paralyzed on one side from that time until
her death in November. A number of witnesses heard her
make references to the agreement and assurances to her
nieces to the effect that they would be remembered. There
is testimony that on one occasion when her nieces Mrs.
Exum and Mrs. Key and her brother N. B. Pearson were
there, she sent for Mr. McCallum and when he came in
she reminded him of the fact that he had never broken
a promise that he had made to her and asked him to keep
the agreement that he had made with her, and that he
told her that he would ''carry it out to the letter,'' or
that he would ''carry it out as they had planned several
years back,'' or ''as they had talked about it several
years ago,'' or to that effect. She was very ill at this
time, and he was very deaf, so her requests had to be
repeated to him by the nurse, Mrs. Brooks.

There is other testimony of N. B. Pearson and Mrs.
McCallum's nieces and nephews in which they relate con-
versations had with Mr. McCallum after his wife's death,
in which he said in substance that they knew how Aunt
Mamie (Mrs. McCallum) wanted things fixed, and that
he was going to carry out the agreement, or words to
that effect.

In the spring of 1931, which was about eighteen months
before his wife's death, Mr. McCallum executed a will
in which he left his wife the farm for life and $20,000
in cash; he left the remainder interest in the farm to his

brother Fenner McCallum, and the three stores in Jackson to his sister, Mrs. Everett; and the remainder of his estate he bequeathed to his brother Fenner McCallum and his sister Mrs. Everett, in the proportion of ⅓ to his brother and ⅔ to Mrs. Everett. He left nothing in this will to his wife's brothers and nephews and nieces. Shortly after his wife's death he destroyed this will and had Judge Everett prepare a second will for him, which, however, was never executed. In this will he bequeathed $1,500 to each of two of Mrs. McCallum's nieces, $500 to a third, and $250 each to fifteen other of her nephews and nieces.

In November, 1936, he had Judge Everett prepare a third will in which he left $1,650 to each of two of Mrs. McCallum's nieces, $650 to a third, and bequests of $400 to each of Mrs. McCallum's nephews and nieces. This will was never executed.

As stated, the chancellor excluded the evidence offered to prove the execution and the contents of the agreement and held that the competent evidence was insufficient to set up a trust in the property of which Mr. McCallum died seized and possessed, and he accordingly dismissed the bill. The assignments of error complain of his action in this regard, and also of his action in excluding the testimony offered to prove the execution of the written agreement and the contents of it, and the testimony of certain of the complainants as to statements made by Mr. McCallum after his wife's death in which he referred to the agreement he had had with his wife and stated that he intended to carry it out.

At the outset the appellants are confronted with the fact that there was no valid consideration passing to Mr. McCallum to support an agreement to leave a half

of his estate to his wife's heirs and next of kin. It is conceded that he had the legal title to all of the property that he and his wife had accumulated. The contention is that he always recognized her right to a half interest in their accumulations because by her industry and frugality, and by her contributions from the gifts and inheritances she had received, she had helped him to acquire what he had and was justly entitled to a half interest in it. We do not think this was a sufficient consideration to support the agreement. He reduced to possession the money which she received by gift from her father and by inheritance, and it became his money. She had no separate estate, and no joint interest in any of the property acquired; it became his property when the title was taken in his name, and an executory agreement to leave an interest in it to her heirs, in the absence of a valid consideration, would not be binding upon him or upon his estate.

■ ■ It is well settled that a voluntary executory agreement will not be enforced as a trust, though the rule is different where the executory agreement is supported by a valuable consideration, or where the trust has been perfectly created and nothing further needs to be done to complete it.

In Perry on Trusts, Vol. 1, sec. 95, it is said:

"Wherever a valuable consideration is paid, the contract will be executed as near to the intention of the parties as possible. . . . In such cases, effect is given to the consideration to carry out the intention of the parties, though informally expressed."

And in section 97 it is said that:

"Where there is a mere intention of creating a trust, or a mere voluntary agreement to do so, and the donor

or settlor contemplates some further act to be done by him to give it effect, the trust is not completely instituted; and if it is voluntary, the settlor cannot be compelled to complete it.''

And in section 98 the author says:

''But if the trust is perfectly created, so that the donor or settlor has nothing more to do, and the person seeking to enforce it has need of no further conveyances from the settlor, and nothing is required of the court but to give effect to the trust as an executed trust, it will be carried into effect at the suit of a party interested, although it was without consideration, and the possession of the property was not changed.''

In Story's Equity Jurisprudence, Vol. 2, at section 973, the rule is stated as follows:

''Uses or trusts to be raised by any covenant or agreement of a party in equity, must be founded upon some meritorious or some valuable consideration; for courts of equity will not enforce a mere gratuitous gift (donum gratium), or a mere moral obligation. Hence it is, that if there be a mere voluntary executory trust created, courts of equity will not enforce it. And, upon the same ground, if two persons for a valuable consideration, as between themselves, covenant to do some act for the benefit of a third person, who is a mere stranger to the consideration, he cannot enforce the covenant against the two, although each one might enforce it against the other. But it is otherwise in cases where the use or trust is already created and vested, or otherwise fixed in the cestui que trust; or where it is raised by a last will and testament.''

Mr. Pomeroy, in his work on Equity Jurisprudence, Vol. 3, section 997, states the rule in the following language:

"The perfect or completed trust is valid and enforcible, although purely voluntary. A voluntary trust which is still executory, incomplete, imperfect or promissory, will neither be enforced nor declared. In order to render the voluntary trust valid and effectual, the party creating it, either by direct transfer or by declaration, must have done everything which, according to the nature of the property comprised in it, was necessary to be done in order to transfer the property and render the transaction binding upon him."

This section from Pomeroy's Equity was quoted at length in Deakins v. Webb, 19 Tenn. App. 182, 187, 84 S. W. (2d) 367, in which case one of the contentions was that the intestate H. D. DeVault had in his lifetime established a voluntary trust in favor of his wife's kin in one-half of his estate, and that the complainants were entitled to have the trust declared and enforced. A decree dismissing the bill was affirmed.

In 26 Ruling Case Law, "Trusts," at sections 23 and 24, it is said:

"It is well settled that in order to raise an interest by way of trust on a covenant or executory agreement there must be a valuable or meritorious consideration. A voluntary trust which is incomplete, imperfect, or promissory will neither be enforced nor aided . . .

"A good or meritorious consideration is that which springs from the natural and moral obligation to provide for and maintain one's wife or offspring. . . . The aid of a court of equity will not be granted to any other person than a wife or a legitimate child of the donee of a power, upon the ground of the provision being for a meritorious consideration."

To the same effect, see 65 C. J., Title, "Trusts," sec. 29.

Aside from the other defenses made we are of opinion that the complainants' case must fail for lack of a sufficient consideration to support the alleged trust agreement. But, for other reasons as well, as we view the record, it must fail.

The complainants base their claim entirely upon the written agreement of January —, 1926, which they allege came into the possession of Mr. McCallum after the death of his wife, and was in his possession shortly before his death; and it is averred that said agreement has not been produced, and that complainants believe that it is in the possession of one or all of the defendants, or that it has been destroyed; and demand was made upon the defendants to produce it, or complainants would prove its contents by secondary evidence; and they aver that ''it has been lost or destroyed if it is not in the possession of or produced by the defendants.'' The defendants both in their answer and in their testimony emphatically deny having ever seen or heard of such a writing until the filing of the bill against them about eighteen months after Mr. McCallum's death, and denied the execution of such a paper by plea of non est factum.

No witness testifies to having seen this paper after February, 1926, at which time, N. B. Pearson, one of the complainants, testified that he was in the McCallum home just after the house had been remodeled, and Mr. McCallum handed his wife some papers to put away, and Mrs. McCallum said to the witness: ''This is the paper that I had at your house,'' and that she then placed it in a tin box in her wardrobe. There is no evidence that Mr. McCallum ever had it in his possession after that, either during his wife's lifetime or after her death; nor is there any testimony that even tends to show that

it ever came into the possession of the defendants, or any one of them.

In view of the emphatic denials of each of the defendants under oath that they had ever seen or heard of such a paper until the filing of the bill, it became incumbent upon the complainants to prove its existence and that it had been unintentionally lost or mislaid, or that it had been fraudulently suppressed or made way with. But there is neither averment nor proof to this effect. Nor is any effort made to supply is as a lost instrument in the manner provided by statute, Code, secs. 9879, 9880; Gibson's Chancery, secs. 942-944. There is no averment or proof of any search or inquiry in an effort to find it. This was necessary. The demand upon the defendants to produce it, in the absence of any showing that they ever had it, did not obviate the necessity of proof of diligent search and inquiry on the part of the complainants in an effort to locate it.

In 2 Jones on Evidence, 1st Ed., sec. 213, the rule is stated as follows:

"Having established the fact of the existence of the document, and its loss, it devolves upon the party to show what steps he has taken to find it. It is the general rule that before secondary evidence of a writing alleged to be lost can be given, there must be proof that a diligent search has been made in the place where it is most likely to be found, and that the search has not been successful. . . . No precise rule has been or can be laid down as to what shall be considered a reasonable effort, but the party alleging the loss or destruction of the document is expected to show that he has in good faith exhausted in a reasonable degree all the sources of information and means of discovery which the nature of the case would naturally suggest, and which were accessible to him."

The complainants have failed either to produce the document or to show that diligent search and inquiry was used in the effort to produce it. We cannot think of any reason why they should have waited for eighteen months after Mr. McCallum's death before they ever mentioned the agreement. Several of the complainants had conversations with Judge Everett after Mr. McCallum's death, and asked whether he had left a will, but did not mention the agreement. We can think of no reason why they should not have mentioned it. Judge Everett testifies to having made a most diligent search for it among all of Mr. McCallum's papers and effects as soon as the matter was brought to his attention by the filing of the bill, but without success.

The proof of the execution of the agreement rests altogether upon the testimony of N. B. Pearson and his son W. D. Pearson and Mrs. Gieula Pearson Exum; Mr. Pearson and his son testified to having heard Mrs. McCallum read it, or the substance of it, and saw the signatures on it, but did not read it or have it in their hands. Mrs. Exum's testimony is to the effect that Mrs. McCallum had told her that she and "Uncle Bob had decided to make an agrement" etc., and called her attention to the fact that it had been signed by both of them, and asked here to put it away for her, which she did. She testified that she saw the signatures on it but did not read it or hear it read.

All the testimony of this character was properly excluded by the chancellor as hearsay and because it was within the rule that neither husband nor wife is competent to testify about matters occurring by virtue of, or in consequence of the marital relation, and because the statements attributed to Mrs. McCallum were not

made in the presence of her husband. If Mrs. McCallum, if living, would not have been permitted to testify to such matters, it follows that the testimony as to the statements she made to these witnesses in the absence of her husband is not admissible.

In construing the statute carried into the code as section 9777, our court in Insurance Co. v. Shoemaker, 95 Tenn. 72, 86, 31 S. W. 270, and in Crane & Co. v. Hall, 141 Tenn. 556, 563, 213 S. W. 414, 416, declared that ''all transactions and conversations had between the husband and wife in relation to their own affairs, not in the presence of some third person, fall within the prohibition of the statute.''

But passing the question of the competency of this testimony, we agree with the conclusion of the chancellor that it is insufficient to prove the execution and contents of the agreement which is the basis of the complainants' suit. The witnesses were testifying as to the contents of a written agreement from having heard it, or the substance of it, read more than thirteen years before, and they undertook to testify minutely and in detail as to its provisions; and yet Mrs. Exum and W. D. Pearson, both of whom examined the signatures, and testify as to the genuineness of them, do not agree in their testimony as to how the agreement was signed by Mrs. McCallum. W. D. Pearson testified that she signed it by her given name, ''Mary E,'' or possibly ''Mamie'' McCallum, and that she did not use the prefix ''Mrs.;'' while Mrs. Exum testified that she signed it ''Mrs. J. R. McCallum.''

The courts generally recognize the inherent weakness of testimony offered to prove the contents of a document not produced at the trial, and this is especially

true where the witness's knowledge is derived from hearing the document read. In most jurisdictions such testimony is held to be inadmissible as hearsay. 10 R. C. L., "Evidence," sec. 133. In Tennessee, however, such testimony is admissible for what it is worth. Morris v. Swaney, 54 Tenn. (7 Heisk.), 591. This was a suit to set up a lost will. The jury were instructed that the complainants were required to establish their case by the best evidence in existence; and if the will was lost, and the subscribing witnesses dead, the will might be proven by "such evidence as would clearly and fully satisfy their minds of its execution and of its contents." The jury set up the will on the testimony of witnesses who had heard it read by the draftsman in the presence of the testator and the subscribing witnesses; and on appeal the verdict was allowed to stand upon the ground that there was *some evidence* to support it.

In Johnson v. Patterson, 81 Tenn (13 Lea), 626, at page 639, the court refers to testimony of this character as "the weakest of all testimony deemed competent." That case grew out of the settlement of the estate of President Andrew Johnson and the question at issue was whether or not a conveyance made by him to his daughter, Mrs. Martha J. Patterson, was intended as a gift, in consideration of services rendered by her as Mistress of the Executive Mansion during his administration, or as an advancement. Among the witnesses who testified in Mrs. Patterson's behalf was a Mr. Fowler, an intimate friend of Mr. Johnson, who testified to a conversation he had with him while a guest in his home in 1871. His testimony was to the effect that Mr. Johnson stated that his sons had been failures, but that he spoke tenderly of his two daughters, Mrs. Patterson and Mrs. Stover, and said he

was greatly indebted to Mrs. Patterson for her services at Washington as Mistress of the Presidential mansion, that she had shown great self-denial, and that by her care and economy she had saved him much money; and that he stated that he had become the owner of the Henderson farm on which she resided and that he intended it for her as some compensation for her services during his administration. This was two years before the deed was executed to her and nine years before the witness testified. The court said:

"In the nature of the thing such testimony has in it elements of inherent weakness—as we all know how difficult it is to repeat language accurately, in a casual conversation, after such lapse of time. We find it almost, if not impossible, to separate our present impressions from what memory actually gives us. In view of this, it is a rule of evidence in our law, that such testimony is the weakest of all testimony deemed competent."

The agreement sought to be set up and enforced by the complainants here cannot be reconciled with any of the three wills prepared by Judge Everett for Mr. McCallum. None of the complainants were mentioned in the will which was executed about 18 months before Mrs. McCallum's death; and neither N. B. Pearson nor W. L. Pearson, brothers of Mrs. McCallum, were mentioned in the drafts of wills which were afterwards prepared but not executed. If the complainants are right in their contention, then, it is clear that Mr. McCallum made no pretense of carrying out the agreement which they say he so solemnly promised his wife that he would carry out to the letter.

As to the sufficiency of the evidence, the law requires that the evidence offered to prove by parol the

execution and the contents of a written instrument which is not produced shall be of the most satisfactory character, or what is known as clear, cogent and convincing evidence. 8 Ency. of Evidence, 359-361, citing among other cases Tisdale v. Tisdale, 34 Tenn. (2 Sneed), 596, at page 607, 64 Am. Dec. 775, where it is said:

"The rule is correctly laid down by C. J. Marshall in 1 Pet. 591 [7 L. Ed. 275]. 'The proof of the contents of a lost paper ought to be such as to leave no reasonable doubt as to the substantial parts of the paper.' "

The language of Chief Justice Marshall in the case referred to, Tayloe v. Riggs, 1 Pet. 591, 600, 7 L. Ed. 275, is as follows:

"When a written contract is to be proved, not by itself, but by parol testimony, no vague uncertain recollections concerning its stipulations ought to supply the place of the written instrument itself. The substance of the agreement ought to be proved satisfactorily; and if that cannot be done, the party is in the condition of every other suitor in court, who makes a claim which he cannot support. When parties reduce their contract to writing, the obligations and rights of each are described, and limited by the instrument itself. The safety which is expected from them, would be much impaired, if they could be established upon uncertain and vague impressions made by a conversation antecedent to the reduction of the agreement."

In Lane v. Jones, 42 Tenn. (2 Cold.), 318, 323, the court say that "the law is justly jealous of the memory of witnesses when they come to speak the contents of a written instrument, which they have merely read." How much more jealously will it regard such testimony of witnesses who do not testify from having read the instru-

ment, but merely from having heard it, or the substance of it, read!

In conclusion we are of opinion (1) that there was no valid consideration passing to Mr. McCallum to support the alleged executory agreement to leave half of his estate to his wife's family; (2) that the testimony offered to prove the execution and contents of the alleged agreement relied upon by the appellants was properly excluded by the chancellor; and (3) that the evidence was wholly insufficient to set up and establish a trust in favor of complainants to the extent of a half interest in the estate of which Mr. McCallum died seized and possessed.

All the assignments of error are accordingly overruled, and the decree of the chancellor is in all respects affirmed at the cost of complainants and their surety on the appeal bond.

Senter and Anderson, JJ., concur.