HOWARD H. LEVIS, appellant, v. E. J. HAMMOND, CLARA
HAMMOND and E. J. HAMMOND, executor of estate
of Dave Flum, deceased, appellees.

No. 49740.

(Reported in 100 N.W.2d 638)

JANUARY 12, 1960.

REHEARING DENIED MARCH 11, 1960.

A. V. Hass, of Chariton, for appellant.

Johnston & Miles, of Corydon, for appellees.

GARFIELD, J.—This is a suit in equity by Howard H. Levis for specific performance of an alleged oral agreement between

Dave Flum and his predeceased wife Maud to make mutual wills in which plaintiff, nephew of Maud, was to be beneficiary, subject to the life estate of the surviving maker. Following trial to the court, relief was denied and plaintiff has appealed. One ground of the trial court's decision is that it would be inequitable to award specific performance.

August 26, 1939, the alleged mutual wills were prepared by E. E. Poston, then an attorney at Corydon, and executed by Mr. and Mrs. Flum. So far as material Dave's will provided:

"1. I give * * * Maud Flum all of the property of which I may die seized * * * for and during her lifetime, * * * with the right at any time she chooses to sell any or all part of said property * * * for her own use, comfort and support.

"2. And at the death of my said wife any balance that remains unused I will and bequeath to my nephew, Harland Howard Levis * * *."

Maud's will was identical with Dave's except for transposition of the two names. Maud died May 7, 1945. On September 4, 1945, Dave went to Mr. Poston's office and said he wanted to draw up another will, that he was having some trouble with plaintiff, they had not been getting along very well, he was going to stay with defendants and wanted to give them his property. Mr. Poston then prepared and Dave executed a new will leaving his property to defendants E. J. Hammond and wife "upon the express condition that they * * * provide a home for me should I become sick or at any time I ask them to * * *."

After Dave and E. J. Hammond were born to prior marriages Dave's mother married Hammond's father. The Flums, who were married in 1901, left no children or other direct heirs. Dave made his home with defendants from October 24, 1945, until he died May 9, 1957. His second will was admitted to probate before this suit was commenced October 30, 1957.

Aside from the terms of the first wills the principal evidence on which plaintiff relies to show they were mutual is this of Mr. Poston:

"They came in for the purpose of making a will or will[s], talking generally of what was going to become of their property and what they wanted to do with it * * *. I think the question came up that Maud said she owned part of the property and

they agreed then they ought to both have wills. She at that time said—or earlier or later, I am not sure—* * * she had inherited some money from her father's estate and had put it into this property and it was decided then to draw a will for each of them. * * *

"I explained to them * * * how these wills would control their property and it was in the nature—I don't now recall what words I used, of course, but told them these wills were in the nature of an agreement and it would control their property no matter what they decided to do later. * * * Yes, they were both well satisfied with that kind of disposition of their property.

"Q. Did both of them tell you on that occasion they wanted it to go to Howard Levis? A. Yes, that was their idea. * * * They didn't issue any instructions but the wills were drawn in accordance with their wishes. * * * It was my custom to read it aloud and I presume I read it aloud to them or gave it to them and they read it. I don't remember which * * *."

Regarding Dave's visit to Mr. Poston's office to have the second will drawn in September 1945, the attorney testified he informed him the previous will "might give you trouble" but Dave replied, in substance, he "didn't care." After the second will was executed Mr. Poston gave Dave the earlier one and did not see it again.

Plaintiff's two propositions for reversal are (1) that the first wills constituted a contractual disposition of the property of both and (2) Dave could not deprive plaintiff of his rights under them by the testamentary disposition contrary to the contractual arrangement between Dave and his wife.

■ I. We have usually defined mutual wills as those executed pursuant to an agreement or compact between two or more persons to dispose of their property in a particular manner, each in consideration of the other. In re Estate of Johnson, 233 Iowa 782, 786, 10 N.W.2d 664, 667, 148 A. L. R. 748, 753, and citations; Luthy v. Seaburn, 242 Iowa 184, 188, 46 N.W.2d 44, 46, and citations; Barron v. Pigman, 250 Iowa 968, 971, 95 N.W.2d 726, 729.

■ Proof of an oral agreement to make mutual wills must be clear and satisfactory. Johansen v. Davenport Bank & Trust

Co., 242 Iowa 172, 173, 46 N.W.2d 48, 49, and citations; In re Estate of Lenders, 247 Iowa 1205, 1213, 78 N.W.2d 536, 541, and citations. We have also said the proof must be clear, satisfactory and convincing. In re Estate of Ramthun, 249 Iowa 790, 799, 89 N.W.2d 337, 342.

While we have never departed from the rule that clear and satisfactory proof is required of such an agreement where specific performance thereof is sought after the death of one party to the claimed contract, we have held it unnecessary that wills contain a memorandum of agreement for mutual wills or by their language show they are the result of such a contract or that the contract be established by direct evidence. Under several earlier decisions the existence of such an agreement might be established by the wills and the surrounding circumstances where it was shown reciprocal wills were those of husband and wife, each acting with the knowledge of the other and the wills were executed at substantially the same time at their joint request. Johansen and Lenders cases, cited last above, and precedents there cited; Allinson v. Horn, 249 Iowa 1351, 1356, 92 N.W.2d 645, 648, and citations.

The Lenders opinion, supra, points out, however, that according to the great weight of authority there must be other evidence than that just referred to of a contract to make mutual wills (page 1214 of 247 Iowa, page 541 of 78 N.W.2d). To like effect are In re Estate of Ramthun, supra, 249 Iowa 790, 801, 802, 89 N.W.2d 337, 344, also Allinson v. Horn, supra, which states: "In recent decisions we have modified the theory that simultaneous execution of reciprocal wills alone creates an inference of the existence of a contract or agreement. We have held that a greater quantum of proof than the execution of the wills is necessary to establish such contract [citations]." (Page 1356 of 249 Iowa, page 648 of 92 N.W.2d) To the same effect is Barron v. Pigman, supra, 250 Iowa 968, 972, 95 N.W.2d 726, 729. See also Note, 44 Iowa Law Review 523, 531-4.

In addition to simultaneous execution of reciprocal wills here we have Mr. Poston's testimony as to his recollection of what was said at the time, although this was about 19 years before the trial. It must be admitted this is a sufficient showing,

even under some of our later decisions, of the existence of an oral agreement to make mutual wills.

II.  However, it does not follow that plaintiff is entitled to specific performance of the agreement.  The trial court found that at Maud's death she had no property in her name and Dave acquired no benefit from her will.  Also that when the first wills were executed and at all times thereafter Dave was the owner of the 159-acre farm and personal property and Maud had nothing upon which her will could operate.  The court also found defendants furnished Dave a home, care, support and nursing for more than 11½ years just before he died, plaintiff did nothing for Dave's comfort or support, and it would shock the court's conscience to grant plaintiff specific performance. Although our review is de novo these findings are entitled to weight.  Groves v. Groves, 248 Iowa 682, 692, 82 N.W.2d 124, 130, and citations.

We think the conclusion inescapable that when the first wills were made and at all times thereafter Maud had no property that would or did pass under her will.  Plaintiff's principal reliance in arguing against the conclusion just stated is upon an inventory in Maud's estate prepared by Mr. Poston, signed and sworn to by Dave as executor on May 12, 1945, which lists the farm and a half interest in the livestock.  The inventory was not filed until December 30, 1957, two months after this suit was started.  Mr. Poston testified that when he learned the farm was in Dave's name he wanted another session with him before he filed the inventory because he wanted it to be according to the facts.  Dave never came back to his office and Mr. Poston never tried to contact him.

That the inventory is false appears beyond fair debate, probably because of some unintentional error in preparing it, not chargeable to Dave.  Although Maud's will was admitted to probate and Dave was appointed executor thereof, nothing further was done toward settlement of any estate evidently because there was no estate to settle.

Baker v. Syfritt, 147 Iowa 49, 56, 59, 125 N.W. 998, 1001, seems to be the first Iowa decision involving joint or mutual wills. It has been cited with apparent approval in most of our later pertinent precedents and by many other courts.

There is nothing in any of our later opinions in conflict with this language from the Baker opinion: "* * * where one maker of such will dies before a revocation thereof by either, *and the survivor accepts any benefit thereunder* [italics added], we think it quite clear that he can no longer revoke, and that any . attempt by him to divert the common estate in any other direction than is indicated by the common or joint devise is nugatory. The rule as deduced from the authorities by the author of the article on Wills in American and English Encyclopedia of Law is stated as follows: 'A mutual will is revocable by the testator at any time prior to his death, and this is so though he survives the other testator, *provided he takes no advantage under the other's will.*' 30 Am. and Eng. Encyc. Law (2d Ed.) 621."

Baker v. Syfritt, supra, also states (page 59 of 147 Iowa): "* * * where two persons competent to make testamentary disposition of property enter into a compact or agreement by which they unite in devising their joint or several estates to a designated third person, subject to a life estate in the survivor, and *upon the death of the one the survivor avails himself of the benefits of the devise in his favor* [italics added], he must in equity be treated as holding the title in trust for the purpose indicated in the compact which became irrevocable upon the death of the other party thereto."

Child v. Smith, 225 Iowa 1205, 1217, 282 N.W. 316, quotes with approval the second of the above excerpts from the Baker opinion. It also approves (at page 1218 of 225 Iowa) a long excerpt from Stevens v. Myers, 91 Ore. 114, 177 P. 37, 2 A. L. R. 1155, 1172, 1173, which includes among the prerequisites of a suit for specific performance against the survivor of an agreement to make mutual wills that there was good consideration for the agreement, acceptance by the survivor of property under the will of the first to die and reasonableness of the agreement.

In re Estate of Johnson, supra, 233 Iowa 782, 789, 10 N.W.2d 664, 667, 148 A. L. R. 748, 753, quotes from Baker v. Syfritt, supra, at page 56 of 147 Iowa, a statement that an agreement to make a joint will is enforceable against the survivor where there is such a will whereby he "takes some benefit

from the estate of the one first deceased," coupled with a devise of the remainder of the estate of both to a third person.

One of our most recent precedents, In re Estate of Ramthun, supra, 249 Iowa 790, 797, 798, 89 N.W.2d 337, 341, says: "It is also generally stated that after the death of one of the parties, *if the other party accepts the benefits or provisions of the will made for him,* then the other party may not dispose of his property otherwise than according to the terms of the will." Citing Child v. Smith, supra, 225 Iowa 1205, 282 N.W. 316, and other cases. The Ramthun opinion also states, "As a general rule * * * equity will lend its enforcement power only to those provisions [of the agreement] that are just and reasonable." Citing In re Estate of Johnson, supra, last above.

57 Am. Jur., Wills, section 717, page 487, states: "The rule is that when two persons have entered into an agreement supported by a good consideration to make, and have actually made, wills with mutual and reciprocal provisions by which each testator has bequeathed his estate to the survivor, *and the survivor has taken and accepted the benefit of such mutual agreement and the will of the other party executed pursuant thereto,* equity will take such action as may be necessary to give effect to the further provision of the agreement that the property of the survivor should be bequeathed to a third person designated by the agreement. *The fact of controlling importance in this situation is the acceptance of the benefits of the agreement and of the wills drawn pursuant thereto.*" (Italics added.)

To like effect is the annotation in 169 A.L.R. 9, 57, which says: "* * * the province of equity * * * is that it grants relief to enforce, not a will, but a contract which has been violated by the defendant or by one under whom the defendant claims, by the revocation of a will which had been executed in pursuance of the contract, *accomplished after the acceptance of benefits under the contract.*" (Italics added.)

Many opinions in cases of this kind say in substance, as we do in Baker v. Syfritt, supra, 147 Iowa 49, 56, 125 N.W. 998, 1001, the surviving testator is precluded from making a different testamentary disposition after accepting the benefits of the agreement and the will executed pursuant thereto. See, e.g.,

Frazier v. Patterson, 243 Ill. 80, 90 N.E. 216, 218, 27 L. R. A., N. S., 508, 17 Ann. Cas. 1003; Brown v. Brown, 53 N. Mex. 379, 208 P.2d 1081, 1089, which quotes at length from Baker v. Syfritt, supra; Rastetter v. Hoenninger, 214 N. Y. 66, 108 N.E. 210, 211, 212; O'Connor v. Immele, 77 N. D. 346, 43 N.W.2d 649, 653, 654; Chadwick v. Bristow, 146 Tex. 481, 208 S.W.2d 888, 890; Auger v. Shideler, 23 Wash.2d 505, 161 P.2d 200, 204; Turner v. Theiss, 129 W. Va. 23, 38 S.E.2d 369; Allen v. Ross, 199 Wis. 162, 225 N.W. 831, 64 A. L. R. 180, 182, 184.

Many other decisions point out, as we do in Barron v. Pigman, supra, 250 Iowa 968, 970, 971, 95 N.W.2d 726, 728, Jennings v. McKeen, 245 Iowa 1206, 1212, 1214, 65 N.W.2d 207, 210, 211, Culver v. Hess, 234 Iowa 877, 14 N.W.2d 692, and other precedents, that the surviving testator accepted the benefits under the agreement and the will of the first to die. If it were immaterial in an action such as this that the survivor obtained property of value under the agreement or the will of the one first to die, it is strange that so many opinions call attention to the fact.

Since Maud had no property when the first wills were made, no prospect of acquiring any except from her husband and none was acquired, we think it was not an abuse of discretion to deny plaintiff specific performance. Although the mutual promises may have amounted to technical consideration for the agreement, the really substantial consideration passed from Dave to Maud. Dave received no real benefit from either the agreement or Maud's will. Certainly there was great inequality of consideration moving from the two makers. Thus the agreement was not sufficiently fair and reasonable to entitle plaintiff to the relief asked.

Plaintiff evidently claims something for the fact that on March 3, 1914, Maud received $661, and on February 13, 1915, $1072, from her father's estate, and in February 1916 the indebtedness on the farm was reduced $1500. Assuming Maud's inheritance was thus applied on the mortgage this occurred more than 23 years before the first wills were made. Clearly any benefit to Dave on this account is wholly unrelated to the agree-

ment to make the first wills. See Pearson v. McCallum, 26 Tenn. App. 413, 173 S.W.2d 150, 155. This observation also applies to the fact Maud performed the usual duties of a farm wife, cared for the chickens and garden, helped with the milking and even with picking corn.

There is no pleading or proof that Dave acted with fraudulent intent in making the second will.

We think our holding finds sufficient support in the authorities heretofore cited, especially the rule approved in Baker v. Syfritt, supra, 147 Iowa 49, 56, 125 N.W. 998, 1001, also In re Estate of Johnson, supra, 233 Iowa 782, 788–791, 10 N.W.2d 664, 668, 669, 148 A. L. R. 748, 754–756, and citations. Moore v. Samuelson, 107 Kan. 744, 193 P. 369, and In re Estate of Hansen, 87 Neb. 567, 127 N.W. 879, referred to in our Johnson case, hold that where the husband owned all the property bequeathed by a joint and mutual will of him and his wife, the latter's joinder in the will would be treated as surplusage and the will considered as that of the husband only—hence ambulatory.

A suit for specific performance of an agreement is always addressed to the sound judicial discretion of the chancellor, guided by the general principles of equity. Relief is not a matter of absolute right but is granted or withheld according to the circumstances of each case. Baker v. Fowler, 215 Iowa 1157, 1159, 1160, 247 N.W. 676, and citations; Vermeulen v. Meyer, 238 Iowa 1033, 1035, 1036, 29 N.W.2d 232, 233, and citations; Holsz v. Stephen, 362 Ill. 527, 200 N.E. 601, 603, 106 A. L. R. 737, 741, 742, and Annotation 742, 751; Annotation, 69 A. L. R. 14, 67; 49 Am. Jur., Specific Performance, sections 8, 9; 81 C. J. S., Specific Performance, section 9 ("* * * where the ground of defense is the unfairness of the contract * * * the court frequently exercises a discretion in the truest sense * * *." Page 421). See also Dullard, trustee, v. Schafer, 251 Iowa 274, 282, 283, 100 N.W.2d 422, 427, 428.

That the general rules governing suits for specific performance apply where the agreement sought to be enforced is for the execution of mutual wills see 4 Page on Wills, Lifetime Ed., sections 1736, 1740.

The equities seem to favor defendants. For more than 11½ years just before his death they provided Dave with a home, care and support under an agreement that they would acquire the property he possessed at death. The Flums, however, furnished plaintiff as a boy a home, care and schooling for about five years. Later when he as a young man worked for Dave on the farm for about four years he was paid for his work. During the time Flum lived with defendants plaintiff never came to see him except in his last illness of about six weeks.

We have already cited herein most of the precedents plaintiff cites. Perhaps Allinson v. Horn, supra, 249 Iowa 1351, 92 N.W.2d 645, deserves further mention. That opinion states (page 1353 of 249 Iowa, page 646 of 92 N.W.2d): "The only question in the case is whether there was sufficient evidence * * * to clearly and satisfactorily establish an agreement between Mr. and Mrs. Allinson to leave all property to the survivor under the identical wills executed by them." The considerations upon which we affirm this decree were not argued or considered in Allinson v. Horn.—Affirmed.

BLISS, OLIVER, THOMPSON, and THORNTON, JJ., concur.

HAYS, J., LARSON, C. J., and PETERSON, J., dissent.

GARRETT, J., takes no part.

HAYS, J.—I respectfully dissent from Division II and the affirmance.

Division I of the majority opinion concedes that appellant has established an oral agreement to make mutual wills, with him as the ultimate beneficiary, and that such wills were duly executed in 1939 by Dave and Maud Flum. I agree.

Division II denies the relief of specific performance on a theory of balanced equities between appellant and the Hammonds. My difference with the majority opinion is based upon a factual, rather than a legal one.

The majority opinion, while conceding the existence of a valid agreement to make the wills, sustains the making of the new will by Dave Flum, after the death of his wife, on the

ground that Dave took nothing under Maud's will. I think that the record shows otherwise, at least in a court of equity. The Flums were married in 1901 and started as tenant farmers. They were frugal and in 1911 they acquired the farm upon which they had been tenants for a consideration of $12,000. They placed a $5000 mortgage thereon. In 1914 or 1915 Mrs. Flum inherited some $1700 and shortly thereafter the mortgage was reduced by $1500. During their entire married life of 44 years she, in addition to being a housewife, assisted with the chores, helped in the field husking corn and annually raised some three to four hundred chickens. She never had a bank account so it is a fair inference that the proceeds therefrom went into Dave's account. At the time the wills were executed, Mrs. Flum stated she owned an interest in the farm because of the use of her inheritance, which statement was made in the presence of Mr. Flum and he made no denial. This led to the making of the mutual wills. After her death, Dave Flum qualified as executor of her will. An inventory was prepared and signed by Dave in which he listed his wife as having at least an interest in the farm and the livestock. While I do not claim that this inventory makes any change in the legal ownership of the property, which was in the name of Dave Flum, and was clearly incorrect to that extent, it does, it seems to me, show an admission upon the part of Dave Flum that his deceased wife had an interest in the property. I think she had an equitable interest therein which passed to him under the will. I think he took value under that will and, under the authorities cited in the majority opinion, his will then became irrevocable.

But the majority opinion states that this being an action for specific performance, the equities are with the Hammonds and denies specific performance. True, Dave Flum lived in the Hammond home the last twelve years of his life, but during this time, except for some two months, he was up and about and able to take care of himself. During this time the Hammonds furnished him with a home, food and laundry. At about the time of Maud's death he cleared the farm of the balance of the mortgage. What property he had at that time does not appear in the record. At the time of his death he had the farm and other assets to the value of $2486.24. For one who was sup-

posedly receiving his board and room without charge, it makes one wonder what became of the normal returns from the farm during the twelve years. There is no competent evidence in the record that the Hammonds were not paid for what they furnished to him. The Hammonds base their claim upon an alleged agreement to leave his property to them if they would care for him. The will so states but it does not represent that Flum owned any particular property or would have upon his death. If he had nothing, they would receive nothing.

As is stressed in the majority opinion, this is a court of equity and equity follows the law. Only in cases where a contract is established will specific performance be denied, where to enforce it would be clearly unjust and shock the conscience of the chancellor. Appellant has established his contractual right and, under this record, his equities appear to me to be at least equal to that of the Hammonds.

I find nothing therein shocking to the conscience and would reverse the case and grant the relief prayed for by appellant.

LARSON, C. J., and PETERSON, J., join in this dissent.