IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 15, 2019 Session

## HUTTON TEAM, LLC v. INGLES MARKETS, INCORPORATED ET AL.

Appeal from the Chancery Court for Greene County
No. 2017-CV-251   Douglas T. Jenkins, Chancellor

———————————————————

### No. E2018-01372-COA-R3-CV

———————————————————

A grocery store, the anchor tenant of a shopping center, objected to the planned construction of a retail auto parts store on an adjacent property, which fronted the shopping center.  In letters to the developer, the grocery store claimed it had approval rights in the adjacent property by virtue of its lease.  The developer sought declaratory relief to settle the dispute and sought damages against the grocery story under several theories, including slander of title.  The grocery store answered and counterclaimed for attorney's fees.  At the conclusion of trial, the court granted the developer its requested declaratory relief, but it dismissed the developer's claims for damages.  The court also declined to award the grocery store attorney's fees.  On appeal, the grocery store claims error in the finding that it lacked approval rights over development of the adjacent property, either by virtue of its lease or equitable theories. The grocery store additionally challenges the denial of its request for attorney's fees for successfully defending against the developer's slander of title claim. Based on our review, the grocery store failed to establish it had approval rights over the adjacent property.  We also conclude that attorney's fees were not recoverable for successfully defending the slander of title claim. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON II, J., joined.

Thomas L. Kilday, Greeneville, Tennessee, for the appellant, Ingles Markets, Inc.

Matthew A. Grossman and Kevin A. Dean, Knoxville, Tennessee, for the appellee, Hutton Team, LLC.

No briefs filed on behalf of the appellees, Tennessee Department of Revenue; Greenwood Properties, LLC; Monticello Properties, LLC; Jimmy L. Bird; Drew Enterprises, Inc.; Paul M. Ross; Stephanie F. Ross; Gail B. Sachs; Michael B. Sachs; Hardee's Restaurants, LLC; Lindsey Arnold; and IBERIABANK Corporation.

## OPINION

### I.

#### A.

On February 20, 1985, Horne Properties, Inc. entered into a lease agreement with Ingles Markets, Inc. to be the anchor tenant in a soon-to-be-built shopping center. Horne planned to develop the shopping center on a portion of a 56.84 acre tract it was acquiring in Greeneville, Tennessee.

The parties' lease required Horne, within thirty days of the execution of the lease, to supply Ingles with "final architectural plans and specifications." The plans and specifications were required to conform with "prototype working drawings" supplied by Ingles for the space it intended to lease. The parties also agreed that the plans and specifications would include "a complete site plan layout indicating the position in the shopping center of all inducement tenants listed in Section 26 hereof (if any) and further depict all driveways, common parking areas, sidewalks, reserve out-parcels, and future expansion areas contemplated for said commercial complex."

The lease granted Ingles "the exclusive right to approve said final architectural plans and specifications within thirty (30) days of certified delivery of said plans and specifications." If the parties could not agree on the plans and specifications, then either party could terminate the lease "upon giving fifteen (15) days written notice to the other." If the parties agreed to the plans and specifications, the lease provided that they would be initialed by the parties and attached to the lease as Exhibit "A." The lease further provided that, "[f]ollowing the attachment of Exhibit 'A' to this Lease Agreement and initialled [sic] by the parties hereto, no alterations or modifications shall be made without the express written consent of [Ingles]." Despite these provisions, the lease was never recorded.

Horne ultimately constructed what would be known as the Greeneville West Shopping Center on roughly 12 acres of its property along Asheville Highway. And Ingles moved into its space in accordance with the lease. Roughly across the parking lot in front of Ingles's space, between the parking lot for the shopping center and Asheville Highway, was an area of greenspace. The greenspace was bounded by two drives leading from the highway into the shopping center parking lot. This area would become the basis of the present dispute.

2

## B.

Over the years, the greenspace area attracted the interest of other parties. In 1999, Horne received an inquiry from "a regional chain restaurant group . . . interested in opening a restaurant" in the front of the shopping center just behind where the greenspace was located. In a letter to Ingles, Horne explained that the restaurant "would obviously affect [sic] the current greenspace and parking lot," but it did not believe that the restaurant would block visibility of the Ingles's space from the highway "in any consequential way." Horne also touted the advantages of adding the restaurant to the shopping center. Horne's letter to Ingles closed with a request for approval of a site plan for the restaurant.

Shortly after receiving the request, Ingles gave a two sentence response. The response acknowledged Horne's letter and stated "Ingles does not agree to this use of our parking areas."

In 2004, Horne floated a different proposal for the greenspace at the front of the shopping center. The president of Horne, Douglas A. Horne, spoke with the president of Ingles, Robert P. Ingle, "numerous times" about the possibility of locating a "very small" branch of First Tennessee Bank in the greenspace area. Mr. Ingles agreed to the proposal. Ingles's outside counsel at the time, Ephraim Spielman, recalled that the approval was given reluctantly. According to Mr. Spielman, several factors influenced Ingles's decision. Among other things, Ingles had a significant banking relationship with First Tennessee and the design of the branch would not significantly impede visibility of the supermarket from the highway.

In a letter from Horne to Mr. Spielman, Horne requested an "appropriate release . . . giv[ing] First Tennessee the right to construct their building at [the shopping center]." The letter enclosed a site plan, floor plan, and an elevation for the branch, "which Mr. Ingle ha[d] verbally agreed to let First Tennessee Bank build in front of [the shopping center]." Mr. Ingles responded with his own letter giving Ingles's consent "to the construction of said bank building in accordance with the floor and elevation plans presented to me."

According to Mr. Horne, Mr. Ingles authorized more than just the construction of the First Tennessee branch; Ingles also agreed to the sale of the land where the branch would be built, consisting of an 0.69 acre parcel, to First Tennessee. Much later Mr. Horne explained why, in his opinion, Mr. Ingles might have agreed to the sale:

> the reason he agreed to it, I think, is because it didn't require a lot of parking. Sixty nine hundredths of an acre is a small outlot. Normally

outlots are an acre or more, and sixty nine hundredths of an acre, that's why they agreed to sell it. Because they weren't going to use much parking.

According to Ingles's attorney, Mr. Spielman, Ingles agreed only to the construction of the branch, not the sale of the parcel.

Whether Ingles agreed or not, on July 22, 2004, Horne sold the 0.69 acre parcel to First Tennessee, and the bank constructed its branch in front of the shopping center. The deed from Horne to the bank included a list of encumbrances, but the list did not include the Ingles lease. Six years later, Horne sold the balance of the shopping center property, consisting of 11.52 acres, to Monticello Properties, LLC. The deed from Horne to Monticello included a list of permitted exceptions, among those were the "[r]ights of tenants in possession under unrecorded leases." The shopping center property was the last of the original 56.84 acre tract that Horne still owned.

C.

By 2015, First Tennessee was looking to sell its 0.69 acre parcel. Hutton Team, LLC envisioned the small parcel as an ideal location for an O'Reilly Auto Parts store. After visiting the site and meeting with local planning staff, Hutton Team commissioned a site plan for the auto parts store. The proposed site plan showed improvements outside of the 0.69 acre parcel. The off-site improvements included sewer and water connections via the parking lot of the Greeneville West Shopping Center. The off-site improvements also included parking spaces and dumpster enclosure at the rear of the auto parts store on the shopping center property and the addition of landscape islands at the end of the parking rows for the shopping center.

In March 2016, Hutton Team approached the shopping center owner, Monticello Properties, about acquiring the property for the off-site improvements. But Monticello Properties demurred on the basis of the lease with Ingles. Monticello Properties pointed out that the lease required the shopping center parking lot to "remain [as] shown on Exhibit 'A' unless written permission [wa]s obtained from [Ingles] for any change or alteration." So in April, Hutton Team approached Ingles, seeking approval of it proposed site plan and off-site improvements.

On June 13, 2016, Ingles responded by letter through its legal counsel. Relying on the provisions of its lease, Ingles asserted that the proposed auto parts store could not "be constructed and developed upon the [0.69 acre parcel] and adjacent common facilities of the Shopping Center without Ingles's approval." Ingles further asserted that its landlord "likewise [wa]s unable to grant permissions to you for development of the O'Reilly facilities without the concurrence of Ingles." The letter concluded that, "[h]aving considered the proposed O'Reilly development, Ingles [wa]s unwilling to approve, and . . . disapprove[d], of the O'Reilly facility within the Shopping Center."

4

Hutton Team read the letter as a denial of its request to include improvements on and to the shopping center parking lot. It then set about creating a revised site plan limiting the development to the 0.69 acre parcel and omitting the off-site improvements.

After obtaining the approval of O'Reilly Automotive Stores, Inc. for the revised site plan, Hutton Team again went to Monticello Properties for approval. Although the revised site plan eliminated the originally proposed off-site improvements, the plan still contemplated sewer and water connections via the shopping center parking lot. Monticello Properties declined to give approval in light of Ingles's previous objection to the development. So Hutton Team again revised its site plan so that the sewer and water connections did not come through the shopping center property.

On June 28, 2016, Hutton Team closed on the purchase of the 0.69 acre parcel. The next month, it received another letter from Ingles's counsel. The letter advised that Ingles had recently received correspondence indicating that Hutton Team was still "working on a potential transaction involving property at the front of the shopping center and in front of the Ingles Store, upon which Hutton wishes to develop and open an O'Reilly Auto Parts store." Ingles understood Hutton Team's plans included the placement of a trash dumpster "upon common areas governed by Ingles'[s] lease" and that its landlord had been asked to approve the "placement of a free-standing ATM" on shopping center common areas. The letter concluded that Ingles was unwilling to approve and disapproved of "either the Dumpster or the ATM within the Shopping Center and reiterate[d] its disapproval of [the] development of an O'Reilly."

Hutton Team saw the latest missive as an objection to improvements outside of the 0.69 acre parcel, which were no longer part of its plans. But as construction was underway on the auto parts store in February 2017, Hutton Team received a final letter from Ingles's counsel demanding that it "immediately cease and desist from all further construction activities." Otherwise, Ingles threatened that it would "pursue available legal and equitable remedies to protect Ingles'[s] rights and in order to enforce the provisions of the Lease precluding such development."

According to Hutton Team, only with the cease and desist letter did it understand that Ingles's objections went beyond off-site "improvements." In a subsequent call, Hutton Team learned that there was no site plan for a proposed auto parts store that would be acceptable to Ingles. This realization led Hutton to request, first from Ingles and then from Horne, the original landlord, a copy of the lease. Although both Ingles and Horne provided copies of the lease, neither could produce the Exhibit A, which was to include "a complete site plan layout indicating the position in the shopping center of all inducement tenants . . . and further depict all driveways, common parking areas, sidewalks, reserve out-parcels, and future expansion areas contemplated for said commercial complex."

5

## D.

In chancery court, Hutton Team sought declaratory relief, an award of damages, and injunctive relief. It asked for a declaratory judgment that Ingles's lease did not encumber or restrict use of the 0.69 acre parcel. Hutton Team also requested a declaratory judgment that no recorded instrument barred the proposed auto parts store. After acquiring the original 56.84 acre tract, Horne recorded declarations of easements and covenants encumbering the property. Additionally, a sign easement encumbered the 0.69 acre parcel. So along with Ingles, Hutton Team named as defendants several other parties who owned or had an interest in lands that were once part of the 56.84 acre tract acquired by Horne.[1]

While the request for declaratory relief related to all defendants, Hutton Team sought damages in tort solely against Ingles. As part of its damages based on Ingles's alleged slander of title, Hutton Team requested recovery of its attorney's fees. Finally, the complaint requested that Ingles be permanently enjoined from interfering with Hutton Team's lawful use of its property.

Ingles denied Hutton Team was entitled to any relief, founded primarily on its claim of a right to approve any development on the 0.69 acre parcel under its lease. Under the lease, no alterations or modifications to the site plan could be made without Ingles's express written consent. Although "Exhibit A" containing the agreed upon site plan layout for the shopping center was missing, Ingles contended that the exhibit could be established as a lost instrument. In one of a succession of amendments to its original answer, Ingles claimed both that the exhibit to the lease had been lost and that the parties to the lease had waived the requirement that the exhibit be initialed and physically attached to the lease.

Ingles also advanced equitable theories for its claimed right of approval. Ingles alleged that it was "the beneficiary of an implied easement to which the property of Hutton [Team] is subject precluding the development undertaken by Hutton [Team] absent Ingles'[s] approval." Ingles also alleged that the 0.69 acre parcel was "subject to an equitable servitude for the benefit of Ingles by which Ingles has the right to approve construction, alterations or modifications to Hutton[] [Team's] property by rights granted

---

[1] The additional defendants included Monticello Properties, LLC; Greenwood Properties, LLC; Drew Enterprises, Inc.; David Gerregano, in his official capacity as the Commissioner of the Tennessee Department of Revenue; Stephanie F. Ross and Paul M. Ross, Trustees of the Ross Family Trust; Michael B. Sachs, Trustee of the Michael B. Sachs Trust; Gail B. Sachs, Trustee of the Gail B. Sachs Trust; Hardee's Restaurants, LLC; Jimmy L. Bird a/k/a Jimmey L. Bird; IBERIABANK Corporation; and Lindsey Arnold, Trustee. As the relief sought against the additional defendants is not the subject of this appeal, we recount the procedural history only as it relates to claims between Hutton Team and Ingles.

6

in the main body of Ingles's Lease independently and in addition to that afforded to it under Exhibit 'A' thereto."

Beyond claiming a right to approve any development on the 0.69 acre parcel, Ingles asserted what it designated as "affirmative defenses" to Hutton Team's claims. Those defenses included notice, estoppel, and unclean hands.

For relief, Ingles sought a declaratory judgment recognizing its approval rights over the 0.69 acre parcel and an order requiring Hutton Team to restore the parcel to its former condition. Ingles also sought recovery of its attorney's fees for defending the action brought by Hutton Team.

Hutton Team moved for partial summary judgment on the issues of notice, implied easement, equitable servitude, unclean hands, estoppel, and lost instrument. Ingles opposed the motion, arguing that there were genuine issues of material fact that precluded summary judgment. The court granted Hutton Team's motion in part. Specifically, it dismissed Ingles's claims and affirmative defenses based on implied easement, equitable servitude, and unclean hands.

Following a trial, the court entered a declaratory judgment in favor of Hutton Team. The court found that the letters from Ingles's counsel put Hutton Team on notice of a potential claim. But even if further investigation had been conducted prior to closing on the 0.69 acre parcel, Hutton Team would only have discovered the exhibit identifying the agreed site plan was missing. The court described the missing exhibit as "basically the linchpin to Ingles'[s] rights in th[e] unrecorded lease."

Turning to the attempt to prove the contents of the missing exhibit, the court determined that Ingles had failed to meet its burden of proof. But even had the burden of proof been met, the court concluded that Ingles no longer had approval rights over the development of the 0.69 acre parcel. It found that Ingles had consented to the sale of the parcel to First Tennessee free from any such restrictions. On this point, the court credited the testimony of Mr. Horne over the testimony of Ingles's attorney, Mr. Spielman. The court also found, based on the close relationship among Ingles, First Tennessee, and Mr. Horne, the parties would have been aware that the conveyance was made without restrictions.

The court also considered the recorded instruments, including the declarations of easements and covenants recorded by Horne and the sign easement. The court concluded that nothing of record would preclude Hutton Team from constructing the auto parts store in accordance with its revised site plan.

As to Hutton Team's slander of title claim, the court found Ingles did not act with malice but rather was reckless in its assertions with respect to the 0.69 parcel. So the

7

court dismissed that claim as well as Hutton Team's other claims for monetary damages. Finally, the court denied Ingles's request for attorney's fees.

## II.

On appeal, Ingles raises five issues. The first four issues relate to the bases under which Ingles claims the right to disapprove of development on the 0.69 acre parcel owned by Hutton Team. The final issue relates to the denial of Ingles's request for an award of attorney's fees.

### A.

Ingles's claims to approval rights over the development of the 0.69 acre parcel are founded on its lease or on equitable principles. First, we address the claims based on its lease, which were resolved after the trial. In non-jury cases, we review a trial court's findings of fact with a presumption of correctness unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

As the party relying on the lease, the burden fell on Ingles to prove the existence of an agreement granting approval rights over the 0.69 acre parcel. *See Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996). The lease precluded alterations or modifications to the shopping center site plan without the consent of Ingles. But Ingles's consent became necessary only after the site plan was agreed upon, attached to the lease as part of an exhibit, and the exhibit was initialed by the parties. Ingles could not produce the referenced exhibit showing that 0.69 acre parcel was part of an agreed site plan.

Initially, Ingles attempted to prove that the exhibit was lost. By statute, "[a]ny lost instrument may be supplied by affidavit of any person acquainted with the facts, stating the contents thereof, as near as may be, and that such instrument has been unintentionally lost or mislaid, and is still the property of the person claiming under it, unpaid and unsatisfied."[2] Tenn. Ann. Code § 24-8-101 (2017). Generally, evidence to establish a lost instrument must be clear and convincing. *Tisdale v. Tisdale*, 34 Tenn. (2 Sneed) 596, 607 (1855); *Pearson v. McCallum*, 173 S.W.2d 150, 158 (Tenn. Ct. App. 1941).

---

[2] Hutton Team does not challenge the applicability of the lost instrument statute. As originally enacted, the statute specifically referenced any "instrument of writing for . . . the conveyance of real estate." 1819 Tenn. Pub. Acts 50.

The trial court found that Ingles failed to meet its burden of proof. We agree. To prove up the lost instrument, Ingles relied primarily on the testimony of Doug Horne, the owner of Horne Properties. Mr. Horne testified that a shopping center site plan was attached to the lease. He further testified that he intended to give Ingles the right to approve any development on what was now the 0.69 acre parcel. But he could not testify that the document Ingles asserted was the missing agreed site plan "was the exact document" attached to the lease.

Incongruently, Ingles also argues that the parties waived the requirement that an agreed site plan be attached to the lease. According to Ingles, "[t]he evidence is undisputed that all parties to the Lease from its inception unto present, being the Lessee, Ingles, and the original and current Lessors, Horne Properties and Monticello Properties, waived any requirement that an 'Exhibit A' be initialed and attached to the Lease." So, "[t]he trial court overlooked or ignored that any 'missing' Exhibit 'A' was not a requirement for establishing Ingles'[s] rights."

We find Ingles's waiver argument unavailing for at least two reasons. First, the record does not support the claim that the parties to the lease waived the requirement of exhibiting to the lease the agreed site plan. Ingles's own witness, Mr. Horne, testified that an agreed site plan was attached to the lease. Second, to the extent Ingles's claims are premised on its lease, an agreed site plan was a prerequisite to an approval right for future alteration or modification to that plan. The lease states as much. It matters not that the original landlord, Horne, and later Monticello Properties sought out Ingles's approval for past development proposals on the 0.69 acre parcel. Those actions can be attributed to other provisions of the lease, such as the requirement that the landlord maintain the parking lot as originally shown in the plans and specifications. Or understandably, the landlords may have sought to avoid approving any development that might upset their anchor tenant, whether or not the lease required them to do so.

B.

Ingles also claims an approval right by "implied easement" or "equitable servitude" over the 0.69 acre parcel, which would prohibit the development of the proposed auto parts store. The court dismissed these claims on partial summary judgment.[3] Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party moving for

---

[3] While making passing reference to the grant of partial summary judgment on Ingles's unclean hands defense, Ingles makes no argument as to how the court erred in rejecting that defense. So we deem the issue waived. *See State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010) ("A reviewing court may deem an issue waived when a party fails to develop an argument in support of its contention or merely constructs a skeletal argument.").

summary judgment has "the burden of persuading the court that no genuine and material factual issues exist and that it is, therefore, entitled to judgment as a matter of law." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If the moving party satisfies its burden, "the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial." *Id.*

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Blair v. W. Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004). We review the summary judgment decision as a question of law. *Martin*, 271 S.W.3d at 84; *Blair*, 130 S.W.3d at 763. So we must review the record de novo and make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been met. *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair*, 130 S.W.3d at 763.

As an initial matter, Ingles complains that the court provided no rationale for granting partial summary judgment. *See* Tenn. R. Civ. P. 56.04. Tennessee Rule of Civil Procedure 56.04 "requires the trial court, upon granting or denying a motion for summary judgment, to state the grounds for its decision." *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). But when the absence of stated grounds does not significantly impair appellate review, we may, in our discretion, decline to vacate the order. *See id.* at 314. We do so here. *See Davidson Pabts, LLC v. Worsham*, No. M2014-01061-COA-R3-CV, 2015 WL 4115174, at *3 (Tenn. Ct. App. May 18, 2015) (determining that the court's failure to state legal grounds was harmless error when the legal grounds were readily discernable from the record).

An implied easement or easement by implication is one of several ways an easement may be created. *Pevear v. Hunt*, 924 S.W.2d 114, 115-16 (Tenn. Ct. App. 1996). An easement may be implied: (1) from the use of land prior to the land being severed by conveyance; (2) "by references to maps and highway boundaries in descriptions of [the] land conveyed"; (3) "by the conveyance of land subject to a general plan of development"; or (4) "by necessity." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.11 cmt. b (AM. LAW INST. 2000); *see also Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 927 (Tenn. 1979). Easements by implication are disfavored. *Cole v. Dych*, 535 S.W.2d 315, 318 (Tenn. 1976).

An equitable servitude, in this context, far from being a separate theory, is but a type of implied easement. *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.1; *see also Equitable Servitude & Restrictive Covenant*, BLACK'S LAW DICTIONARY (10th ed. 2014). So we address Ingles's equitable theories as one.

Discerning the basis for an easement by implication in this instance is difficult. Ingles's pleadings were nebulous on the point. But in moving for partial summary judgment, Hutton Team assumed that Ingles was asserting the presence of a general plan

10

or development. When a developer sells land with restrictions designed to implement a general plan of development, he "impliedly represents to the purchasers that the rest of the land included in the plan is, or will be, similarly restricted." *Massey v. R.W. Graf, Inc.*, 277 S.W.3d 902, 910 (Tenn. Ct. App. 2008) (quoting RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.14 cmt. i). Equity will impose an implied negative reciprocal easement on the remainder of the property included in the common plan. *Id.* If a common plan has been established, "the fact that some lots in a subdivision are sold with no restrictions does not invalidate restrictions on the other subdivided lots." *Moore v. Phillips*, No. 01A01-9605-CH-00197, 1998 WL 272942, at *3 (Tenn. Ct. App. May 29, 1998). While our courts recognize this equitable doctrine, we only apply negative reciprocal easements with great care. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976).

Hutton Team argued that the common plan doctrine could not apply in this case. A comment in the Restatement (Third) of Property provides that an easement on the basis of a general plan of development should only be implied "when the developer does not follow the practice of recording a declaration of servitudes applicable to the entire subdivision or other general-plan area." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.14 cmt. i. Horne, the developer of the shopping center, had recorded declarations of easements and covenants covering the original 56.84 acre tract of which the shopping center was once a part.

On this record, the court did not err in granting Hutton Team partial summary judgment on Ingles's equitable theories. Horne recorded servitudes applicable to both the current shopping center parcel and the 0.69 acre parcel. Ingles offered no basis to imply additional servitudes beyond those already of record.[4]

C.

Finally, we consider Ingles's claim that the court erred in denying its request for attorney's fees. Tennessee courts follow the "American rule" on attorney's fees. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). Under the American rule, "litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). Litigants may also be awarded attorney's fees if "some other recognized exception to the American rule applies." *Cracker Barrel Old Country Store, Inc.*, 284 S.W.3d at 308.

---

[4] Because Ingles did not establish that its lease granted approval rights over the development of the 0.69 acre parcel and its equitable theories were properly dismissed, we do not reach the question of whether the conveyance of the 0.69 acre parcel to First Tennessee Bank also entitled Hutton Team to declaratory relief.

Here, Ingles contends a recognized exception to the American rule applies based on one of our unreported decisions. In *Brooks v. Brake*, this Court stated "[l]itigants who successfully defend a libel of title action may recover reasonable expenses incurred in defending that suit." No. 01A01-9508-CH-00365, 1996 WL 252322, at *4 (Tenn. Ct. App. May 15, 1996). We disagree.

In stating that litigants may recover reasonable expenses in defending against a libel of title action, we cited *Ezell v. Graves*, 807 S.W.2d 700 (Tenn. Ct. App. 1990). But *Ezell v. Graves* stands for a different proposition, namely that litigation expenses incurred in removing a cloud from the title of property may be recovered as special damages in a libel of title action. 807 S.W.2d at 702-03. We reasoned then that often "[t]he sole way of dispelling another's wrongful assertion of title is by hiring an attorney and litigating." *Id.* at 703. Still, this exception to the American rule is "narrow"; to recover attorney's fees, "the litigant must prove the elements of a libel of title action, including malice, before an award of legal fees is appropriate." *Brooks v. Lambert*, 15 S.W.3d 482, 485 (Tenn. Ct. App. 1999).

We also note that *Brooks v. Brake* did not involve a defendant seeking recovery of attorney's fees for successfully defending against a libel of title. *See Brake*, 1996 WL 252322, at *3. Instead, the defendants were challenging the award of attorney's fees to plaintiffs as damages. *Id.* We held that, because defendants "acted with reckless disregard of the [plaintiffs'] rights as property owners," their "actions could constitute malice sufficient to establish a libel of title claim." *Id.* at *4. Because plaintiffs successfully prosecuted their libel of title claim, thus successfully defending their title, we concluded that the plaintiffs could recover reasonable expenses incurred in their lawsuit. *See id.*

Despite the language from *Brooks v. Brake*, the exception to the American rule for libel of title actions does not apply in this instance. A party who successfully defends against a claim of libel or slander of title is not entitled to recovery of attorney's fees on that basis.

**III.**

We affirm the judgment of the trial court. The court appropriately granted Hutton Team declaratory relief. Ingles failed to show that it had approval rights over the development of Hutton Team's 0.69 acre parcel. And the court properly denied Ingles's request for an award of attorney's fees, despite Ingles having successfully defended against Hutton Team's slander of title claim. This case is remanded to the trial court for further proceedings as are necessary and consistent with this opinion.

12

_____
W. NEAL McBRAYER, JUDGE